WILBURN MARTIN, Plaintiff-Appellee, v. CHICAGO HOUSING AUTHOR-
ITY, Defendant-Appellant.

First District (6th Division)   No. 1—92—2344

Opinion filed June 17, 1994.

Moore & Maisel (Gary K. Moore and Thomas J. Branit, of counsel) and

French, Kezelis & Kominiarek, P.C. (Richard G. French and Russell P. Veldenz, of counsel), both of Chicago, for appellant.

Mark S. Komessar, of Komessar & Wintroub, of Chicago, for appellee.

JUSTICE McNAMARA delivered the opinion of the court:

Plaintiff, Wilburn Martin, brought this negligence action against defendant, Chicago Housing Authority (CHA), to recover for injuries he sustained after falling from an elevator located on CHA property. The jury returned a verdict against the CHA in the amount of $3,059,000, and reduced that amount by 17% to $2,538,970 as a result of plaintiff's comparative negligence. That amount was further reduced by the amount of a settlement reached between plaintiff and his employer, Mid-American Elevator Company, to $2,358,424.43, and judgment was entered on January 27, 1992. The CHA appeals, contending that it owed no duty of care to plaintiff as a matter of law. In addition, it contends that the trial court erred in refusing to give the jury an instruction incorporating the language of section 343 of the Restatement (Second) of Torts.

The relevant facts are as follows. On May 17, 1984, the date of the accident, plaintiff and Daniel Walter were repairing the two elevators situated inside the CHA's mid-rise housing project located at 3833 South Langley in Chicago (the Langley building). Plaintiff was employed by Mid-American as an elevator mechanic's helper and Walter as an elevator mechanic. In November 1983, Mid-American had entered into a contract with the CHA to make emergency repairs to various CHA elevators. The contract defined such repairs as "that work necessary only to restore an elevator from a nonoperating condition to an operating condition." No routine inspections or preventive maintenance of the elevators was authorized to be performed by Mid-American employees under the contract. In his capacity as a mechanic's helper for Mid-American, plaintiff was permitted to assist the mechanic in the performance of these emergency repairs only, pursuant to specific job tickets issued by the CHA for each and every repair.

Plaintiff first began working on elevators in 1979 when he was hired by Otis Elevator Company as a mechanic's helper. While at Otis, plaintiff was regularly paired with a mechanic on repair jobs and was assigned to work primarily in Chicago housing projects. Plaintiff had never been classified a mechanic, as such a classification required specific training and testing, which plaintiff had never undergone. Through on-the-job experience, however, plaintiff became familiar with many aspects of elevators, including their construction, maintenance and repair.

Plaintiff testified that besides repairing elevators for the CHA, Otis had a separate maintenance arrangement whereby it would routinely inspect and maintain the elevators, replace worn and damaged parts and lubricate components when necessary. After leaving Otis, plaintiff went to work for Westinghouse Elevator Company repairing CHA elevators. As with Otis, Westinghouse also had a separate maintenance arrangement with the CHA.

After leaving Westinghouse, plaintiff began repairing elevators directly for the CHA as part of a new in-house repair program. According to plaintiff, this in-house program was initiated in 1981 and was terminated in November of 1983. Unlike the arrangement with Otis and Westinghouse, the in-house program did not include maintenance of the elevators; the program was limited in scope to the repair of nonoperating elevators. During the two years in which the program was in effect, no routine inspections or maintenance of the elevators was performed by anyone either inside or outside the CHA.

There were two elevators in the Langley building, designated No. 1 and No. 2. Elevator No. 1 stopped at the first floor and each of the odd-numbered floors above it, while elevator No. 2 stopped at the first floor and each of the even-numbered floors above. There were no doors or doorways permitting access to elevator No. 1 on the even-numbered floors or to elevator No. 2 on the odd-numbered floors. The elevators were installed in the 1960s when the building was constructed.

Plaintiff testified that he was constantly repairing the elevators in the Langley building. From mid-February 1984, until May 21, 1984, plaintiff serviced the elevators about 40 times. He recalled that there had been a great deal of corrosion on the top of the elevator from which he fell—elevator No. 1—owing to the collection of water and moisture there. Plaintiff stated that identical elevators situated in non-CHA buildings would not have had rust on top of them because water would not have been allowed to collect. Nor would these elevators have had open or broken wires, as elevator No. 1 did, because the wires would have been properly run through steel piping. He would never find broken piping in non-CHA buildings because if the piping broke, it would be immediately repaired. Plaintiff stated that CHA foremen and janitorial staff were aware of the condition of the elevators in the Langley building.

Plaintiff explained how repairmen can operate an elevator from on top of it. He described the inspection switch, stating that when it was in a normal position, persons using the elevator could direct it to specific floors by pushing the call button. In the normal mode, the

elevator would run at approximately 100 feet per minute. When the switch was clicked into inspection mode, the elevator would run at about half the normal speed or 50 feet per minute. The inspection mode prevented persons from calling the elevator to a particular floor or from opening the elevator doors. Plaintiff stated that he often rode on top of elevators at normal speed to get from one place to another, but added that it was uncommon to perform inspection work at that speed.

In addition to the inspection switch, there was also a direction switch, which enabled repairmen to direct the elevator up or down from on top of the elevator, and a "red button," which, when pushed, would automatically stop the elevator and prevent the elevator doors from opening or closing. These control buttons, along with the inspection switch, were solely for the safety of the repairmen servicing the elevator.

Plaintiff identified a photograph of the top of elevator No. 1 and noted that the trough containing the elevator wiring was not in its proper position. The trough was bent when it should have been straight, and it had been in that condition since at least 1981. In addition, some of the wiring was out of its protective housing, which increased the risk of the wiring being severed from the switches connected to it and exposed the wiring to water and moisture. The wiring had been in this condition at least since 1981. Plaintiff explained that the wiring provided the power for all of the elevator's functions and also powered the control switches located on top of the elevator.

Plaintiff also identified in the photograph a buildup of rust on the trough. Plaintiff testified that rust should not be permitted to build up around electrical wiring because the electrical current cannot carry it. On several occasions, plaintiff discovered that the reason an elevator would not function was because a wire had been broken or was so caked with corrosion that the electrical current was unable to pass through to power the elevator.

On the date of the accident, plaintiff arrived at the Langley building and was handed a job ticket which informed him that elevator No. 1 was "down." Plaintiff recalled that the elevator door was off its track on one of the floors and that the door's safety edge was missing. Plaintiff restored the elevator to service temporarily without installing the safety edge. He did not need to use the control buttons on top of the elevator for this repair; rather, the elevator was moved to the necessary location using the controls in the machine room located above the top floor of the 14-story building. Plaintiff explained that the elevator needed to be placed back in service even

though it had not been permanently repaired because elevator No. 2, which was also out of service, needed to be repaired.

Plaintiff climbed atop elevator No. 2 while Walter, who was in the machine room, utilized the controls to run the elevator down to the first floor. While inside the shaft repairing elevator No. 2, plaintiff noticed that elevator No. 1 was running sporadically in that it would run for a while and then stop for a prolonged period of time.

When elevator No. 2 was positioned at just below the first floor for repair, Walter shut off the power to the elevator so that it would not move while plaintiff was repairing it. At this point, plaintiff and Walter could only communicate by calling up and down the shaft. When plaintiff did what he could to fix elevator No. 2, he waited for elevator No. 1 to come down to the first floor and stepped onto its top. Plaintiff was going to run the elevator up and check the door locks on one of the middle floors because he had noticed while repairing elevator No. 2 that it lingered in that vicinity. There were no lights on in the shaft.

While standing on top of elevator No. 1, plaintiff attempted to activate the inspection switch, which would have allowed him to control the speed and movement of the elevator and prevented passengers both inside and outside the elevator from controlling or directing the elevator's movement. When he hit the inspection switch, the elevator doors closed but instead of the car remaining stationary initially and then ascending at the slower inspection speed, it began to ascend at normal speed. Because the switch did not function properly, plaintiff had no control over the speed or movement of the elevator. Plaintiff hit the "red button" in an effort to stop the car, but that button also was not functioning. At this point, plaintiff was "feeling pretty comfortable, and [was] not scared or anything."

Plaintiff told passengers inside the elevator to get off the car as soon as it stopped because it was running erratically. He wanted to prevent the passengers from being stuck in the car in the event it stopped at a floor with no opening to the hallway. The passengers exited the elevator on the seventh floor. The car then immediately "took off" to the eleventh floor. Plaintiff still had no control over the car. He attempted to communicate with Walter in the machine room to have him put the car in inspection mode. Plaintiff called out, but Walter did not hear him.

When the car got to the eleventh floor, the doors opened and began to close again, but failed to do so completely. Plaintiff stated that this problem was not unusual, but that under normal circumstances he would have had the elevator moving at the inspection speed and been able to position the car exactly where he needed it to

repair the doors. Plaintiff, because he was standing on top of the car, was actually at the twelfth floor level and was facing a concrete wall instead of an opening to the hallway since elevator No. 1 serviced only odd-numbered floors.

Plaintiff explained that until the doors were aligned, neither he nor persons in the hallway could direct the elevator's movement. In an effort to get the elevator to a point of safety, plaintiff leaned over the elevator and attempted to pull on the weight controlling the door operator so that the doors would align and lock and the elevator would move again. Plaintiff had planned to get back to the cables and hold on before the car started to move; under normal circumstances, there would be a few seconds delay after the doors closed before the car would move. In this case, however, when plaintiff let go of the weight, the elevator, rather than slowly accelerating, jerked into full speed movement, throwing plaintiff off balance. Plaintiff's momentum carried him in the direction of the hoist cables, and his arm got caught on an angle iron connected to the side of the shaft. When the car began to move upward, the angle iron, and his arm, failed to move with it. At this point, plaintiff "flipped off the side of the car." Plaintiff's pants leg was caught on the edge of the car-top, causing him to be suspended upside down. He began ascending with the elevator, with his body hitting metal brackets along the way. Plaintiff stated, "I decided that if I could get loose, if I can yank my leg or whatever, I was going to go over into the other hatch. I was going to try and get loose and fall in the other hatch. I figured it was better than being decapitated or, you know, chopped in half trying to stick to the side of that car waiting to get up another—."

Plaintiff was successful in getting over to the other hatch. He stated, "[t]hen I realized that I was 120 feet in the air, 110 feet in the air. And I thought—my mind—you know, this is all happened in a matter of seconds. So I thinking that when I get over here, I will be safe. But that feeling went away quickly when I didn't never land on anything. *** I couldn't see anything, but my mind told me to get loose, and everything will be okay." Plaintiff explained that if he had not attempted to get loose, he likely would have been crushed or lost a limb upon elevator's No. 1's eventual descent.

As plaintiff was falling, he attempted to turn his body around so that he was no longer descending head first. He used one of his arms to hook onto a rail connected to the side of the shaft. In doing so, he broke his hand, wrist, and shoulder. He continued to fall down the shaft, now "behind first," and landed on top of elevator No. 2. When he tried to move, plaintiff discovered that he had no control of the area below his waist. He also noticed that his arm was broken.

Plaintiff was freed from the shaft 2¹/₂ hours later. In addition to his broken arm, hand, wrist and shoulder, plaintiff sustained a dislocated right hip and a broken left hip, a fractured pelvis and ankle, and a deep laceration to the chest. Doctor Lawrence Pottenger, plaintiff's treating physician, testified that the injuries to plaintiff's hips and ankle would be permanently disabling, and the pain associated with those injuries would be permanent as well.

Plaintiff stated that the control switches on top of the elevator had worked on prior occasions, and he had no way of knowing they were not going to work for him this time. In order to determine this, he would have had to take the cover off the control panel, get a meter and check all of the wires individually to ensure current was running through them. This sort of inspection was not authorized, however, without a job ticket. He considered such an inspection to be maintenance, not an "emergency repair." He stated that in downtown buildings, the control switches and wiring were checked constantly. In plaintiff's opinion, had the CHA had a maintenance program in place in 1982, 1983 and 1984, this clearly would have been an item to be inspected and maintained.

On cross-examination, plaintiff acknowledged knowing "the basics" of elevator repair, and stated that he had seen repairs made to car-top controls on prior occasions. He also acknowledged working on top of elevators on prior occasions and riding the elevators at normal speed. Plaintiff stated that he did not personally perform the control-top repairs. Only a mechanic, with specific knowledge of electricity and electrical wiring, would perform such repairs. As a mechanic's helper, he had never been requested to replace a trough or any of the wiring inside it. According to plaintiff, he "was pretty much nuts and bolts. [He] didn't do any electrical work." On the date of the accident, plaintiff did no electrical wiring or anything having to do with the control switches located on the top of elevator No. 1.

Plaintiff was familiar with the elevators in the Langley building and knew the risks associated with working on top of them. As a mechanic's helper, he had never seen repair personnel wear a safety belt to perform the sort of repairs he undertook on the date of the accident. Plaintiff stated that it was dangerous to wear a safety belt doing these types of repairs because if a repairman did fall, it would be unsafe for him to be dangling from the belt with live elevators operating. Plaintiff stated that there was an escape hatch on top of the elevator, but he could not open it from the outside as it was bolted shut from the inside.

Virgil Cross testified for plaintiff that he worked for the CHA in a variety of capacities and for many years was the CHA's assistant

maintenance superintendent. Cross was familiar with the Langley building, having worked there at one time for the CHA. Cross confirmed that beginning in 1966, the CHA entered into contracts with Otis and then with Westinghouse to not only repair the elevators in the Langley building but to maintain them as well. Under these contracts, the companies were responsible for making regularly scheduled inspections of the elevators, replacing worn parts and oiling and greasing various elevator components on a routine basis.

The contract with Otis expired in 1980, at which time Westinghouse began servicing the CHA. Cross could not recall how long Westinghouse's contract was in effect. He stated that there had been a gap in time from when Westinghouse's contract ended and Mid-American's contract began, but he denied that during this gap the CHA had initiated its own in-house repair program.

Cross confirmed that in November 1983, the CHA entered into the contract with Mid-American to make emergency repairs to its elevators and acknowledged that, unlike the prior contracts with Otis and Westinghouse, no preventive maintenance or routine inspections were called for under the contract. Mid-American was authorized to perform only that work necessary to restore an elevator from a nonoperating to an operating condition. Cross testified as to the significant number of elevator "downs" in 1983 and was disturbed by the amount of money the CHA was paying out for elevator repair.

Cross stated that the two elevators in the Langley building were used to transport members of approximately 100 families living in the building, as well as their personal belongings, which included heavy furniture. The building contained no separate freight elevators. This sort of usage, according to Cross, contributed to the wear and tear of the elevators. In addition, the cold air and dampness to which the elevators were subjected—by virtue of the fact that the elevators were partially outside—also contributed to their wear and tear.

Cross confirmed that the standard job ticket contained three possible blocks from which to choose in describing the type of work involved: "outage," "maintenance," and "repair." He stated that all but 3 of the 55 job tickets for January through May 1984 were for "outages" or "repairs." None of the job tickets had "maintenance" checked off. During the time Mid-American was doing repair work for the CHA at the Langley building, no other companies were performing maintenance work on the elevators.

On cross-examination, Cross stated that only Mid-American employees had access to the elevator car tops. CHA janitors did not have authority to go onto the car tops or to test or repair the elevators. On redirect examination, Cross stated that the CHA had

intended, as of March 30, 1984, to institute an elevator maintenance training program for its janitors, but that it was never carried out.

Rachel Ray testified for plaintiff that she was one of the passengers riding in elevator No. 1 shortly before the accident. While she and her sister were in the elevator, they heard plaintiff talking to them from on top of the elevator. Plaintiff told them to "hurry up and jump off the elevator" as it was going to fall. Ray stated that as they exited the elevator on the seventh floor, plaintiff yelled to them for help. Shortly thereafter, the elevator "failed." Ray ran down to the first floor, where she found plaintiff hanging upside down screaming for help.

Robert Bailey, part owner of Mid-American, also testified for plaintiff. In 1983, the CHA contacted Mid-American and negotiated a contract through Bailey under which Mid-American would perform emergency repair services on some of the CHA's elevators; these were the only services for which Mid-American would be paid under the contract. Bailey testified that "[t]he elevators in the CHA were in a deplorable condition." Bailey confirmed that emergency repairs were only those repairs which would "restore broken down elevators to an operating condition." According to Bailey, the CHA would inform Mid-American which elevator was down, and Mid-American repairmen would restore it to operating condition. At no time did the CHA contact Mid-American to expand the scope of the contract to include inspection or maintenance services.

Bailey asked the CHA several times orally and by a letter dated May 10, 1984, if it would allow Mid-American to perform mainte-nance services on the elevators in the Langley building. Bailey felt that a maintenance schedule would eliminate a great many of the shutdowns experienced in that building. Bailey stated that the CHA asked Mid-American to send it a proposal, which it did on May 10. The proposal, which was sent to Cross, recommended spending an hour every other week per elevator performing maintenance ser-vices. The CHA never responded to the proposal. Prior to this, on March 30, 1984, the CHA had notified Mid-American that it was taking steps to implement its own in-house elevator maintenance program.

On cross-examination, Bailey acknowledged that Mid-American repairmen frequently worked on top of elevators and often utilized the car-top controls. He agreed that the repair of a broken car-top control would be considered a "repair" as defined in the contract. On redirect examination, Bailey stated that even if Mid-American em-ployees were on tops of elevators every hour, that fact alone did not give them any more authority under the contract to perform mainte-

nance services to those elevators or to fix problems not connected with the specific reason the elevator was failing to operate on a particular day. Bailey stated that in the event a repairman discovered a dangerous condition while on top of the elevator, he would advise the CHA that work needed to be done, and the CHA would decide whether to authorize the repair. If the condition was not remedied, Mid-American would shut the elevator down.

On re-cross-examination, counsel for the CHA directed Bailey to language in the contract which specified that the contractor would be responsible for correcting violations of applicable codes and complying with requirements of applicable public agencies at no additional cost. Bailey stated that this was "boilerplate" language not applicable to the limited type of contract Mid-American had with the CHA; rather, the language was for contracts where maintenance was required. Bailey testified that in any event, the contract authorized the correction of code violations only where it did not necessitate additions or changes to the elevator equipment or parts or its method of operation.

On re-redirect examination, Bailey stated that repairmen could not always visually detect the extent of an elevator's problems without further investigation. This was particularly true with electrical wiring; without regular inspections, it was impossible to tell whether the wiring was in a safe or dangerous condition.

Dale Piechocki, an elevator inspector for the City of Chicago, testified for plaintiff that he performed semiannual inspections of new and existing elevators to ensure compliance with the city's municipal code. On November 16, 1983, the Langley building elevators were inspected and were found to be in violation of the section of the municipal code, which, according to Piechocki, requires that "every supply facility or piece of equipment that's installed or maintained in a building should be maintained in a safe, sound working condition." The elevators were also found to be in violation of the section which states that "every owner-operator must comply with the requirements imposed on him by this chapter, maintain in a clean, sanitary, and safe condition the shared or public areas of the dwelling or premises and maintain and repair any equipment of a type specified in this code which he supplies and is required to supply." Piechocki stated that the notice of violation was sent to the superintendent of the CHA's elevator division. According to Piechocki, the violations remained unremedied for several months, up to and including the date of plaintiff's accident.

Piechocki examined the elevators in the Langley building shortly after the accident. He identified elevator car-top wiring violations on

elevator No. 1. According to Piechocki, the wiring was in a bad state of disrepair. On the basis of his examination, he sent the CHA a notice regarding both elevators and instructed it to put all the hoistway wiring in a safe, proper working condition, to replace missing door lock covers where necessary, to clean the hoistway, car tops and pits, and to put all the doors, locks, closers and related equipment in safe, proper working order.

On cross-examination, Piechocki stated he was uncertain as to whether the inspector on November 16, 1983, identified a problem with the car-top controls on elevator No. 1.

Walter testified for the CHA. He identified a job ticket for a repair performed on February 13, 1984, which indicated that a broken wire or eyelet connected to elevator No. 1's car-top inspection switch had been repaired. He testified that approximately one-half of the repairs made to the Langley building elevators were done from atop the elevators. He and plaintiff would often ride on top of the elevators without using the car-top controls primarily "in the interest of speed" and also to observe the elevator in normal operation to ascertain the source of a particular problem. He stated that at inspection speed, the car doors would not open and, therefore, a problem could be easily overlooked.

The sole job function of Walter and plaintiff was to "repair[ ] specific jobs to get the car back in operation as indicated by the ticket." Walter stated that plaintiff had no expertise in the repair of electrical parts or wiring and was not making any repairs related to the car-top control switches on the date of the accident.

On cross-examination, Walter was shown various photographs of the top of elevator No. 1, and he stated that the trough containing the wiring was not in its proper position and the wiring itself should not have been exposed. Walter confirmed that some of the wiring shown was or should have been connected to the car-top control switches.

Walter stated that the February 13 repair of the inspection switch wire was treated like any other repair. It was discovered that the bad wire was the reason the elevator was deemed to be "nonoperating," and the wire was thus repaired. Walter did not make an inspection of the entire trough, the wiring or the switches. Walter did not consider any of the work he did in the Langley building during 1984 to be maintenance-type work. He stated that the condition of the cars in the Langley building made them appear as if they were installed a hundred years ago.

We first address the CHA's contention that plaintiff's recovery is barred under section 3—102 of the Local Governmental and

Governmental Employees Tort Immunity Act (Tort Immunity Act) (Ill. Rev. Stat. 1983, ch. 85, par. 3—102). In relevant part, section 3—102 provides:

> "(a) Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use *in the exercise of ordinary care* of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used ***." (Emphasis added.) (Ill. Rev. Stat. 1983, ch. 85, par. 3—102(a).)

The CHA argues that the foregoing language of the Tort Immunity Act limits its duty of care to those intended and permitted users of property who were in the exercise of ordinary care for their own safety while on the property. The CHA asserts that since plaintiff was found to be 17% comparatively negligent, he could not have been exercising ordinary care for his safety, and as such, the CHA owed no duty of care to him and thus cannot be liable for his injuries.

■ We need not consider the merits, if any, of the CHA's argument because the record reveals that the CHA failed to raise it in the trial court. It is well settled that governmental tort immunity under the Tort Immunity Act must be raised and pled as an affirmative defense or else it is waived. (Ill. Rev. Stat. 1991, ch. 110, par. 2—613; *McCall v. Chicago Board of Education* (1992), 228 Ill. App. 3d 803, 593 N.E.2d 621; *First National Bank v. Village of Mundelein* (1988), 166 Ill. App. 3d 83, 519 N.E.2d 476.) This is so even if the evidence supports the existence or appropriateness of the defense. *McCall*, 228 Ill. App. 3d at 811, 593 N.E.2d at 627; *Village of Mundelein*, 166 Ill. App. 3d at 90, 519 N.E.2d at 481.

At trial, the CHA chose to rely upon plaintiff's own negligent misconduct as its sole affirmative defense; at no time did it plead or even remotely suggest that the Tort Immunity Act might serve as a bar to plaintiff's recovery in the event he was found to be comparatively negligent for his injuries. Indeed, the CHA stated that it had "no objection" to giving the jury Illinois Pattern Jury Instructions, Civil, No. 10.03 (3d ed. 1993) (IPI Civil 3d) which states, in relevant part, that "plaintiff's contributory negligence, if any, *does not bar his recovery*." (Emphasis added.) Likewise, the CHA did not object to the giving of IPI Civil 3d Nos. 45.01 and 45.05, which further instructed the jury as to the law of contributory (now known as comparative) negligence and the computation of damages thereunder. The record is devoid of any evidence that the CHA argued or submitted instructions to the effect that plaintiff's recovery would be barred as a result of his contributory negligence. Significantly, counsel for the

CHA stated in closing argument that if the jury found plaintiff to be contributorily negligent, it should reduce any award by the extent of his fault. Having elected not to raise the Tort Immunity Act as a defense to plaintiff's claim of negligence in the trial court, we hold that the CHA is precluded from raising it for the first time in this court. The issue is waived.

The CHA also contends that it did not owe a duty of care to plaintiff because the condition of the elevator did not create an unreasonable risk of harm to him, the dangers were known or obvious to him, and it had no reason to expect that an elevator repairman would not protect himself against the dangers posed by the elevator's condition. Plaintiff contends, on the other hand, that the CHA owed him a duty of care in view of the fact that the dangerous condition which proximately caused his injuries, namely, the failure of the car-top control switches, was within the CHA's exclusive power to prevent. Plaintiff argues that the deteriorated condition of the switches involved an unreasonable risk of harm to him which was known or should have been known to the CHA, and that the CHA failed to exercise reasonable care to protect him against the danger arising from this condition.

■ To prevail on a claim for common law negligence, a plaintiff must prove that: (1) the defendant owed him a duty of care, (2) the defendant breached that duty, (3) he was injured, and (4) the defendant's breach proximately caused his injury. (*Ward v. K mart Corp.* (1990), 136 Ill. 2d 132, 554 N.E.2d 223.) While the questions of whether a duty has been breached and whether the breach proximately caused an injury are factual matters, the existence of a duty must be determined by the trial court as a matter of law. *Ward*, 136 Ill. 2d at 140, 554 N.E.2d at 226.

In determining whether a duty exists, the trial court considers whether plaintiff and defendant stood in such a relationship to one another that the law imposed upon the defendant an obligation of reasonable conduct for the plaintiff's benefit. (*Ward*, 136 Ill. 2d 132, 554 N.E.2d 223.) Factors relevant in determining whether a duty exists include: the foreseeability of the injury, the likelihood of injury, the magnitude of the burden of guarding against the injury, the consequences of placing that burden on the defendant, and the possible seriousness of the injury. *Deibert v. Bauer Brothers Construction Co.* (1990), 141 Ill. 2d 430, 566 N.E.2d 239.

The CHA apparently does not dispute that plaintiff was its business invitee. Generally, a property owner owes business invitees on its premises a duty of reasonable and ordinary care to maintain its premises in a reasonably safe condition. (*Deibert*, 141 Ill. 2d at 437,

566 N.E.2d at 242.) As discussed below, however, some limitations to this general rule exist.

■ Our supreme court has adopted sections 343 and 343A of the Restatement (Second) of Torts regarding the duty of possessors of land to their invitees. (See *Fancil v. Q.S.E. Foods, Inc.* (1975), 60 Ill. 2d 552, 328 N.E.2d 538; *Ward*, 136 Ill. 2d 132, 554 N.E.2d 223; *Deibert*, 141 Ill. 2d 430, 566 N.E.2d 239.) Section 343 provides:

> "A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
>
> (a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
>
> (b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
>
> (c) fails to exercise reasonable care to protect them against the danger." Restatement (Second) of Torts § 343, at 215-16 (1965).

Section 343A provides the following exception to section 343:

> "A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, *unless the possessor should anticipate the harm despite such knowledge or obviousness.*" (Emphasis added.) Restatement (Second) of Torts § 343A(1), at 218 (1965).

Comment *f* to the Reporter's Notes to section 343A explains further the duty of the possessor of land as set forth in section 343A:

> "There are *** cases in which the possessor of land can and should anticipate that the dangerous condition will cause physical harm to the invitee notwithstanding its known or obvious danger. In such cases the possessor is not relieved of the duty of reasonable care which he owes to the invitee for his protection. This duty may require him to warn the invitee, or to take other reasonable steps to protect him, against the known or obvious condition or activity, if the possessor has reason to expect that the invitee will nevertheless suffer physical harm." Restatement (Second) of Torts § 343A, Comment *f*, at 220 (1965).

The foregoing principles expressed in the Restatement are consistent with the general duty of reasonable care owed to invitees and, as such, are relevant to the resolution of whether an injury was reasonably foreseeable. *Ward*, 136 Ill. 2d at 151, 554 N.E.2d at 232.

■ Turning to the specific facts of the present case, we agree with the trial court that the CHA owed plaintiff a duty of care. We conclude that the injury plaintiff sustained was reasonably foreseeable under the circumstances. Plaintiff testified that the CHA had ceased performing regular inspections and preventive maintenance

of the elevators in the Langley building in 1981 when the contract with Westinghouse expired. At that time, the CHA instituted its own in-house repair program, of which plaintiff was a part. That program, however, was limited solely to the repair of problems which caused an elevator to be inoperable; it did not include routine inspections or maintenance of the elevators. Subsequently, when the CHA terminated its in-house program in November 1983, it entered into the contract with Mid-American. As the record indicates, however, the contract was expressly limited to the performance of "emergency repairs," which the contract defined as only those repairs necessary to restore a nonoperating elevator to an operating condition. Further, Cross confirmed that the CHA's contract with Mid-American was unlike the prior contracts it had with Otis and Westinghouse in that it did not authorize routine inspections or preventive maintenance of the elevators, which maintenance would have included the repair or replacement of damaged or worn parts. Cross was aware of the significant number of elevator "downs" in 1983 and 1984 for elevator No. 1. Cross further testified that he knew that the environmental conditions such as the number of users and exposure to the elements of temperature and dampness were causing extensive wear and tear on the elevators, yet the CHA did nothing more than repair what was necessary to get the elevator running.

Bailey testified that the elevators in the Langley building were in a "deplorable condition." Walter testified that the car-top wiring was in a gross state of disrepair, with the trough containing the wiring out of its proper position and the wiring itself—some of which led to the inspection switch and other car-top controls—improperly exposed to the elements, causing rust and corrosion to form. Moreover, Piechocki testified that in November 1983, the CHA was cited for violations of the municipal code because the elevators were found not to have been maintained in a safe, sound, working condition. According to Piechocki, this violation went unremedied by the CHA for several months and extended beyond the date of the accident. Piechocki examined the elevators again following the accident and testified that the car-top wiring on elevator No. 1 was in a bad state of disrepair and had been in that condition for some time prior to the accident. On the basis of his examination, he sent the CHA yet another notice regarding the condition of the elevators.

Bailey further stated that on several occasions he requested the CHA to allow Mid-American to perform maintenance services on the elevators and in fact submitted a proposal regarding such services pursuant to the CHA's request. However, the CHA never responded to the proposal.

As the foregoing aptly demonstrates, the CHA knowingly allowed its elevators to fall into a state of deterioration and refused to take any steps to restore them to a reasonably safe condition. Even during the two years in which the CHA's own in-house repair program was in place, it still did nothing more than make the repairs necessary to get the cars operating, notwithstanding the visibly deteriorated state of the equipment. Under these circumstances the CHA cannot be heard to complain that the injury plaintiff sustained was not reasonably foreseeable.

The CHA argues, however, that the condition of the elevator did not pose an unreasonable risk of harm to plaintiff because he worked on the elevator on a daily basis and was thus aware of the dangers involved. In effect, the CHA maintains that plaintiff assumed the risk of his injury. The CHA also argues that, in view of the fact that plaintiff worked on elevator No. 1 with such frequency, its condition, particularly of the car-top controls and wiring, was open and obvious to him. Hence, it owed no duty to plaintiff.

In support of its contention that the condition of the elevator did not pose an unreasonable risk of harm to plaintiff, the CHA cites cases involving police officers and firefighters who incurred injuries when, in an emergency, they entered onto privately owned property in the discharge of their official duties. In the first of these cases, *Fancil*, the invitee was the plaintiff's decedent, a police officer who had been shot and killed while inspecting the defendant's unlighted premises. The plaintiff alleged that the defendant owed the decedent a duty to light the premises in order to protect him from his assailants. Our supreme court, applying section 343 of the Restatement, held that the danger to which the decedent had been exposed was not an unreasonable risk, stating:

> "The risk to which the decedent was subjected because of the conditions which existed upon the defendant's premises was the same risk which every police officer encounters while conducting security checks in both residential and commercial areas. The danger of being ambushed by criminals lurking in poorly illuminated areas, in shadows or behind objects is a risk inherent in the occupation. Hence, the danger to which the decedent was subjected was not an unreasonable risk for a police officer." *Fancil*, 60 Ill. 2d at 558, 328 N.E.2d at 541.

The supreme court applied the same reasoning in *Washington v. Atlantic Richfield Co.* (1976), 66 Ill. 2d 103, 361 N.E.2d 282, also cited by the CHA and which was a case involving a fireman who was injured while attempting to extinguish a fire. The court recognized that a fireman is entitled to the same degree of care as any other

invitee generally, but concluded that a landowner's duty does not extend to acts of negligence which actually cause the fire. The court stated that "the function of a fireman is to deal with fires, and he assumes the risks normally associated with that function when he enters upon that employment." *Washington*, 66 Ill. 2d at 109, 361 N.E.2d at 285.

The CHA attempts to apply the foregoing reasoning to the situation in the present case. The CHA argues that *Fancil* and *Washington* stand for the proposition that *any* risks posed by conditions which bring *any* worker onto a landowner's premises are risks which are inherent in the worker's job, and as such are not unreasonable risks imposing a duty upon the landowner to protect or warn against. We decline to expand the "policeman/fireman rule" to that extent. Indeed, a similar attempt to extend the rule to a situation not involving police officers or fire fighters was made by the defendant in *Atchley v. Berlen* (1980), 87 Ill. App. 3d 61, 408 N.E.2d 1177, and rejected by the court. The court stated:

> "The defendants endeavor to analogize *Fancil* to the instant case by contending that the danger of slipping on a ramp greasy with blood from slaughtered animals is a risk inherent in the plaintiff's occupation as a meat inspector, the plaintiff was well aware of this risk, and consequently his decision to act despite the risk involved excused the defendants from their duty to maintain the ramp in a safe condition. However, *the defendants' attempt to make the analogy fails because the risk present in this case is not necessary nor inherent in the occupation itself*, as was the case in *Fancil* (for police officers) or *Washington* (firemen). The occupations of police officers and firefighters are inherently dangerous. Police officers and firemen subject themselves to the possibility of bodily harm and even death every day. *It is a risk that cannot be avoided.* This does not hold true for the risk involved in the instant case. Certainly, it is to be expected that a certain amount of blood and grease will accumulate on the floors of a slaughterhouse, but the risk created by such a condition can be easily avoided by periodically cleaning the floors when the conditions create a hazard. \*\*\* The risk here, as opposed to the risk in *Fancil*, was not inherent in the occupation of the plaintiff. Rather, it was created by the negligence of the defendants." (Emphasis added.) *Atchley*, 87 Ill. App. 3d at 65-66, 408 N.E.2d at 1180-81.

■ Similarly, in the present case, plaintiff was injured as a result of the unreasonably dangerous condition of the elevator brought about by the CHA's failure to adequately inspect and maintain it, or to permit others to do so. The chain of events leading to plaintiff's injury began with the failure of the inspection switch and other car-

top controls, the sole purpose of which was to allow plaintiff to control the speed and movement of the elevator for the benefit of his own safety. As a result of the failure of these controls—which the CHA apparently does not dispute—plaintiff had no control over the elevator and became stuck at the eleventh floor. Because he was on top of the elevator, plaintiff faced a concrete wall on one side of him and an open shaft on the other. Plaintiff called to Walter for assistance, but received no response. In the condition the elevator was in at this point, neither he nor anyone in the hallway could direct the movement of the elevator. Plaintiff believed that the only way he could reach a point of safety was to attempt to align the elevator doors so they would close and the elevator would move. He leaned over and maneuvered the door mechanism, and the elevator, rather than slowly accelerating, jerked into full speed movement, causing him to fall from it.

As the foregoing illustrates, the risk of harm which plaintiff faced was neither unavoidable nor inherent in his occupation as an elevator mechanic's helper. To the contrary, had the CHA authorized Mid-American to perform routine inspections and maintenance of the elevator and its component parts—including the car-top controls—or had it undertaken to perform these functions itself, as it had done for many years in the past, the malfunction of the inspection switch and other controls could have been prevented, and the risk encountered by plaintiff could have been avoided. We thus reject the CHA's contention that the condition of the elevator did not involve an unreasonable risk of harm to plaintiff.

■ We also reject the CHA's contention that the dangerous condition of the elevator, and more specifically the car-top controls, was known and obvious to plaintiff, thereby exempting it from liability under the open and obvious danger rule set forth in section 343A of the Restatement. While plaintiff in fact testified that the elevator was in "pretty bad shape" and noticed that the wiring on the car-top was corroded, there is no evidence that he knew before he was placed in the perilous situation that the car-top control switches would malfunction when they did. Indeed, they had operated normally days and months before the accident, notwithstanding their deteriorated condition, except for one day when a wire required repair. When plaintiff climbed atop the elevator on the date of the accident, he fully expected the controls to work.

Even had plaintiff known of the dangerous condition, however, the CHA would nevertheless remain liable because the circumstances here indicate that the CHA could and should have anticipated that plaintiff would have proceeded to encounter the danger in order to

perform his normal job duties under the contract. (See Restatement (Second) of Torts § 343A, at 218 (1965); *Deibert*, 141 Ill. 2d 430, 566 N.E.2d 239; *Dinkins v. Ebbersten* (1992), 234 Ill. App. 3d 978, 600 N.E.2d 873.) As stated, the CHA was aware that the elevator was in an unsafe condition because it had been informed as such as early as November 8, 1983, by the City of Chicago. Nevertheless, the CHA refused to allow Mid-American or any other company to perform anything other than "emergency repairs" on the elevator. The CHA ignored the requests by Mid-American for authorization to perform badly needed maintenance on the elevator, despite its deteriorated condition. Yet it invited and permitted repairmen, including plaintiff, to work on and about the elevator to make emergency repairs.

■ The CHA also argues that plaintiff knew about the defective condition of the car-top controls before he actually fell from the elevator, and as such, no obligation existed to protect him. We do not agree. When plaintiff learned that the controls were not functioning, he was already placed in a position of peril because he no longer could control the speed or movement of the elevator and was uncertain where the elevator would carry him. It is apparent to us that the discovery of the condition from which the risk of harm arose, namely, the failure of the car-top controls, occurred simultaneously with the creation of the condition. Thus, plaintiff, having once discovered the condition, was no longer able to avoid the risk of harm arising therefrom. Under these circumstances, the CHA had an obligation to protect plaintiff from the condition. (See *Longnecker v. Illinois Power Co.* (1978), 64 Ill. App. 3d 634, 381 N.E.2d 709.) The fact that plaintiff did not remain on top of the elevator and wait for help, but chose instead to lean over the edge to align the doors, after which he fell, is relevant not to the question of the CHA's duty, but to plaintiff's own comparative negligence.

■ We further find that the magnitude of the burden on the CHA to exercise reasonable care to protect repairmen like plaintiff—who were hired to perform emergency repairs only—is no greater than that which the CHA had experienced for many years prior to 1981. For two decades, the CHA regularly inspected, maintained and repaired the elevators in the Langley building. The CHA has failed to demonstrate that its decision to terminate these services was anything other than financially motivated. In our view, that is an inadequate reason for not imposing a duty of ordinary care on the CHA to maintain its elevators in a reasonably safe condition. Contrary to the CHA's contention, this duty would not require it to maintain its elevators in "mint condition" or "to prevent all dangers from arising." The duty is one of reasonableness under the circumstances, and

the CHA can still expect that its passengers and repair personnel will exercise reasonable care for their own safety. *Ward*, 136 Ill. 2d at 156, 554 N.E.2d at 234.

For the foregoing reasons, we hold that the CHA owed a duty of care to plaintiff to maintain the elevators in a reasonably safe condition for his use as an elevator mechanic's helper performing exclusively emergency repairs to those elevators.

As a final matter, the CHA contends that the trial court erred in refusing to give the jury an instruction which incorporated the language of section 343 of the Restatement (Second) of Torts, as follows:

> "It was the duty of the defendant, Chicago Housing Authority, as an owner of the property in question, to exercise ordinary care to see that the property was reasonably safe for the use by Wilburn Martin if, but only if, it:
>
> (a) Knew or by the exercise of reasonable care should have discovered the dangerous condition, and should have realized that it involved an unreasonable risk of harm to Wilburn Martin;
>
> (b) Should have expected that Wilburn Martin would not discover or realize the danger, or would fail to protect himself against it; and
>
> (c) Failed to exercise reasonable care to protect Wilburn Martin from the danger."

The trial court denied the instruction, holding that whether a duty exists is a question of law to be decided by the court, not the jury. Instead, the court gave the jury IPI Civil 3d No. 120.02.02, which was tendered by plaintiff and reads as follows:

> "It was the duty of the Chicago Housing Authority, as owner of the property in question, to exercise ordinary care to see that the property was reasonably safe for the use of Wilburn Martin."

Initially, we note that the determination of which instructions shall be given to the jury is within the sound discretion of the trial court, whose decision we will not disturb absent a finding of clear abuse. (*Hollembaek v. Dominicks Finer Foods, Inc.* (1985), 137 Ill. App. 3d 773, 484 N.E.2d 1237.) For the reasons which follow, we conclude that the trial court did not abuse its discretion in refusing to give the CHA's tendered instruction.

■ As previously stated, our supreme court has held that the considerations conveyed in sections 343 and 343A of the Restatement should be taken into account *by the trial court* in determining *whether a duty exists*, and, more specifically, in determining whether an injury was reasonably foreseeable. (*Ward*, 136 Ill. 2d at 151, 554 N.E.2d at 226; *Deibert*, 141 Ill. 2d at 438, 566 N.E.2d at 243.) The supreme court has made it clear that the extent of a landowner's duty to its busi-

ness invitees is that of reasonable and ordinary care to maintain its premises in a reasonably safe condition (*Deibert*, 141 Ill. 2d at 437, 566 N.E.2d at 242), and the jury is to be so instructed—as it was here—once a duty is found by the court to exist. The instruction which the CHA proposed would have required the jury to ascertain whether a duty existed in the first instance, which was clearly outside the scope of its responsibilities. For this reason, the instruction was properly denied.

The CHA argues, however, that the instruction is justified by this court's ruling in *Ono v. Chicago Park District* (1992), 235 Ill. App. 3d 383, 601 N.E.2d 1172. In *Ono*, the trial court accepted the defendant park district's non-IPI jury instruction regarding a landlord's duty to an invitee regarding criminal attacks by third persons. The instruction stated:

> "Generally, there is no duty to protect others from criminal attack by third persons unless there are sufficient facts to put defendant on notice that a criminal attack is reasonably foreseeable. If you find that the criminal attack on the plaintiff had not been reasonably foreseeable, then your verdict should be for the Chicago Park District." *Ono*, 235 Ill. App. 3d at 386, 601 N.E.2d at 1174-75.

The plaintiff in *Ono* argued that the instruction improperly required the jury to determine whether a duty existed. This court rejected that argument, concluding that the instruction in effect informed the jury that the defendant owed the plaintiff a duty to protect against reasonably foreseeable criminal activity, which was a correct statement of the law. (*Ono*, 235 Ill. App. 3d at 388, 601 N.E.2d at 1176.) More importantly, we found that the law set forth in the instruction was the sole basis of the defendant's theory of the case, and that defendant was thus entitled to have the instruction given. See *Marin v. American Meat Packing Co.* (1990), 204 Ill. App. 3d 302, 562 N.E.2d 282.

In the present case, the CHA's theory was that plaintiff's own negligent misconduct was the proximate cause of his injuries, and the trial court accordingly instructed the jury as to the law of comparative negligence. The proferred instruction was therefore not essential to the jury's understanding of the CHA's case.

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

Judgment affirmed.

RAKOWSKI and GIANNIS, JJ., concur.