THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. JANICE SIMESTER *et al.*, Defendants-Appellants.

First District (4th Division)   Nos. 1—94—4064, 1—94—4065 cons.

Opinion filed March 27, 1997.

422

William Hedrick, of Skokie, for appellant Janice Simester.

O'Keefe, Lewis & Bruno, P.C., of Skokie (Louis M. Bruno, of counsel), for appellant Dale Simester.

Jack O'Malley, State's Attorney, of Chicago (Renee Goldfarb, Timothy Felgenhauer, and Linda Woloshin, Assistant State's Attorneys, of counsel), for the People.

JUSTICE BURKE delivered the opinion of the court:

After a jury trial, defendants Janice and Dale Simester, who are married, were each convicted of two counts of criminal neglect of an

elderly person and sentenced to 30 months' probation and 1,000 hours of community service. On appeal, defendants contend that the statute under which they were prosecuted, sections 12—21(a)(2) and (a)(3) of the Criminal Code of 1961 (720 ILCS 5/12—21(a)(2), (a)(3) (West 1992)), was unconstitutional, they were not proven guilty beyond a reasonable doubt and they were denied a fair trial because inadmissible and prejudicial evidence was presented by the State. Defendants also contend that the trial court erred in barring their expert from testifying at trial and in refusing their proffered jury instructions. For the reasons set forth below, we affirm.

At trial, the evidence established that defendant Janice Simester lived in the same household with her codefendant, Dale Simester, their two young children and the victim, her 74-year-old uncle, Stanley Pierzga, who had lived with her and her parents for over 20 years. When Janice's parents died, she continued to live with and care for her uncle in her parents' home.

Thomas Stotts, a paramedic with the Oak Forest fire department, testified that at 7:58 p.m. on August 10, 1993, he was called to defendants' home. Janice answered the door and told him that the victim was upstairs. Stotts immediately noticed a strong smell coming from the house and, while proceeding upstairs, the smell became much stronger. He entered the victim's bedroom, where he found him lying on the floor in a fetal position. The victim and his bedroom were filthy. The victim's clothes, hands, bedding, floor and television were covered with feces. His clothes were also urine soaked. After checking the victim's vital signs, Stotts shook him but was unable to get a response. When he attempted to roll the victim onto his back, the victim's clothing stuck to the floor. The victim remained in a rigid fetal position even after he had been placed on his back. Because Stotts and the other paramedics who had joined him were becoming ill from the strong smell, Stotts left the room to retrieve a stretcher to remove the victim.

Stotts further testified that because it was police procedure to respond to all ambulance calls, an Oak Forest police officer arrived at the scene. In the presence of the officer, Stotts then asked Janice about the victim. Janice responded that the victim had simply fallen and needed some help. Eventually, the victim was placed on a stretcher and taken to the ambulance. However, the victim's body remained in a retracted, fetal position and his limbs would not relax even when the paramedics pushed on them. After the victim's clothes were removed, he was placed on advanced life support. According to Stotts, the victim appeared very thin, undernourished and dehydrated, and had wet as well as dried feces "pretty much all over him."

Victoria Barrera, an emergency room nurse at Palos Community Hospital, testified that shortly after the victim arrived she had to put on a mask and gown "because the odor was so bad we couldn't be in there without getting taken back by the fumes." She stated that the victim was in a fetal position, had bedsores and was covered with urine and feces. Although the victim was in the emergency room for approximately four hours, the staff could not get him completely clean before transferring him to an intensive care unit.

Dr. John Massimilian testified that he treated the victim when he was brought into the emergency room and found him to be totally covered with dried urine and crusted feces. He described the victim as being "extremely cachectic," indicative of malnutrition and dehydration. A urine output test revealed that the victim was so severely dehydrated as to cause him to be in "profound shock," and that he was also suffering from renal failure. An albumen test indicated that the victim had not had nutritional intake for at least one week and perhaps much longer. Neurological tests indicated that the victim was in a deep coma, which took at least several days to develop and which would have prevented him from speaking earlier in the day. With respect to the victim's rigid fetal position, Dr. Massimilian stated that contracture of that severity generally took at least two weeks to develop. He also stated that the victim's arms and legs had limitations of motion of 85% and 95%, respectively, and that those percentages had to have existed for two weeks prior to his admission to the hospital. The doctor also noted that the victim had a large bedsore on his left hip, which had penetrated to less than an inch from the bone. He stated that the bedsore took approximately one week to develop.

Robert Gayton, a barber, testified in behalf of defendants that Janice would bring the victim to him for haircuts, that the victim was grouchy to Janice and that, while cutting the victim's hair, he noticed a body odor.

Attorney Edward Grossman testified that he drafted the victim's will in 1989. At that time, he noticed that the victim had a body odor, was crotchety and that defendants' house had an odor.

Dale's father, Raymond Simester, testified that when he last saw the victim on July 4, 1993, he was very frail and humped over. He stated that he had known the victim for eight years and that the victim had always had a bad odor about him.

Mary Lynn Smith, Janice's cousin, testified that the victim had always kept himself in an unkempt condition and was generally grumpy. She stated that she had known Janice to be a truthful person.

Defendants sought to call Sara Lieber, a licensed social worker, as an expert witness in geriatric care, and the State objected. The court stated that it would *voir dire* Lieber and, outside the presence of the jury, Lieber testified that she was a licensed social worker and geriatric care manager and had a bachelor's degree in sociology. She stated that she had previously testified in criminal cases as an expert on the psychological effects of certain conditions which might have influenced an individual to commit a crime. She stated that she had testified in those cases in her capacity as a social worker and that the cases involved either an insanity defense or that of "battered woman syndrome." She further testified that she and her firm had been the court-appointed guardian for at least 50 elderly persons. However, when questioned by the court, she admitted that she had no formal medical training.

The court then asked counsel what his offer of proof as to Lieber would be. Counsel responded that Lieber had investigated the victim's condition by interviewing Janice and reviewing the police reports and hospital records. Her conclusions were that the victim had experienced a series of long-term health problems and that his condition resulted from self-neglect. With respect to his nutritional deficiencies, Lieber concluded that the victim's personal preferences and the condition of his teeth prevented him from consuming certain foods. Lieber also concluded that Janice had made an effort to care for the victim but lacked the necessary specialized knowledge.

In denying defendants' motion to call Lieber as an expert witness, the court stated that she did not even "come close" to having the qualifications to review medical reports and to render an opinion with respect to the nutritional and physical condition of the victim.

Dale Simester testified that after both of his wife's parents died, Janice was responsible for the care of her uncle, the victim, while he, Dale, had no responsibility for his care. He testified that the victim would not even allow him to come into his room. He stated that he saw the victim on August 4, 1993, before he left for a three-day golf outing. He did not see the victim again until the day of the incident. On that day, Janice told him that the victim had fallen, and he heard the victim tell her to leave him alone. Later in the evening, Janice told him that she checked on the victim, found that he was having trouble breathing and was going to call a doctor. Dale admitted that although he knew that the victim had fallen at approximately 5 p.m., he and his wife left the house to pick up their children and did not check on him again until after 7 p.m.

Janice Simester testified that while her husband was away on his golf outing, she had no one to help her with her household duties

and, as a result, she did not check on the victim as much as she should have. She further stated that, until the day of the incident, she believed that the victim was in good health. However, after hearing the medical evidence and seeing the photographs of the victim, she realized that her assessment of his health was incorrect. She also stated that on the day of the incident she went up to the victim's room after she arrived home from work. When she knocked on the door, the victim was "hollering." She found that the victim had fallen, but he told her that he could get up by himself. She noted that the bed sheets were soiled, so she stripped his bed. After leaving the victim in order to pick up her children from day care, she returned to find him still lying on the bedroom floor. She further stated that when she first observed him on the floor, she did not observe the feces on his body and clothing.

The jury subsequently found each defendant guilty of two counts of criminal neglect, and the trial court sentenced them to 30 months' probation and 1,000 hours of community service. These appeals followed.

Defendants contend that the statute under which they were prosecuted, sections 12—21(a)(2) and (a)(3) (720 ILCS 5/12—21(a)(2), (a)(3) (West 1992)) is unconstitutionally vague and violates due process of law by failing to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden. They contend that the statute is overbroad in that it presumptively imposes medical and psychiatric knowledge on a lay person for diagnosing and correctly treating the preexisting ailments of the elderly or disabled. They assert that the statute violates equal protection in that, while it imposes such specialized knowledge on a lay person, it exempts from criminal liability those caregivers who actually possess such specialized knowledge and training and who are licensed to give such specialized care. They also argue that by making it an offense to fail to give adequate care to the victim on the basis that one "should reasonably know" the proper care, the statute "impermissibly adopts a civil negligence standard and enforces it as a criminal felony." They further maintain that because the statute prevents a defendant from asserting as a defense that he reasonably believed that a person (here the victim) was not an elderly or disabled person, the statute fails to require culpable intent and, therefore, impermissibly punishes innocent as well as culpable conduct.

■ Section 12—21(a) of the Criminal Code of 1961 provides:

"A person commits the offense of criminal neglect of an elderly or disabled person when he is a caregiver and he knowingly:

(1) performs acts which cause the elderly or disabled person's

life to be endangered, health to be injured, or pre-existing physical or mental condition to deteriorate; or

(2) fails to perform acts which he knows or reasonably should know are necessary to maintain or preserve the life or health of the elderly or disabled person and such failure causes the elderly or disabled person's life to be endangered, health to be injured or pre-existing physical or mental condition to deteriorate; or

(3) abandons the elderly or disabled person." 720 ILCS 5/12—21(a) (West 1994).

The statute defines "caregiver" as a person who has a duty to provide for an elderly person's health and personal care at the person's place of residence, including but not limited to food and nutrition, shelter, hygiene, prescribed medication and medical care and treatment. 720 ILCS 5/12—21(b)(3) (West 1994). The statute provides that the term "caregiver" shall include:

"a parent, spouse, adult child or other relative by blood or marriage who resides with or resides in the same building with and regularly visits the elderly or disabled person, knows or reasonably should know of such person's physical or mental impairment and knows or reasonably should know that such person is unable to adequately provide for his own health and personal care." 720 ILCS 5/12—21(b)(3)(A) (West 1994).

However, the term "caregiver" specifically excludes health care providers (and their employees) who are licensed under the Nursing Home Care Act (210 ILCS 45/1—101 *et seq.* (West 1992)) or the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 1992)). 720 ILCS 5/12—21(b)(3) (West 1994).

■ In reviewing defendants' argument, we find that they have misapprehended the nature of the statute and what may properly constitute the basis for a constitutional challenge of such a statute. Initially, defendants assert that the statute is vague because its terms are so ill-defined that their meaning "rests upon the opinions and whims of the trier of fact, rather than upon any objective criteria or facts." However, after making such a pronouncement, they fail to direct our attention to any portion of the statute that they believe fits their assertion of vagueness. Next, without any argument or citation to authority, defendants assert that the statute presumptively imposes medical and psychiatric knowledge upon them for the purpose of diagnosing and correctly treating preexisting ailments of the person in their care. Apparently defendants are referring to section 12—21(a)(2), but they ignore the plain language of the statute, which mandates that a caregiver perform acts that he knows or reasonably should know are necessary to maintain the elderly person's health. Again, without any type of argument or citation to authority,

defendants assert that, because the statute contains the words "reasonably should know," it "impermissibly adopts a civil negligence standard and enforces it as a criminal felony." Finally, defendants contend that, because the statute specifically states that a defendant may not assert as an affirmative defense that he reasonably believed that a person was not elderly or disabled, the statute fails to require culpable intent and, therefore, impermissibly punishes innocent as well as culpable conduct. Defendants fail to advise this court how precluding an accused from defending himself on the basis that he did not reasonably believe the victim to be elderly or disabled must be equated with the concept of whether or not he reasonably should have known the consequences of his acts or failure to act.

It is well settled that a reviewing court is entitled to have the issues clearly defined with pertinent authority cited and is not a depository in which an appellant may place the burden of argument and research. *Bank of Ravenswood v. Maiorella,* 104 Ill. App. 3d 1072, 1074 (1982). Any issue that has not been sufficiently or properly presented to this court for review may be deemed waived. 155 Ill. 2d R. 341(e). In light of the insufficiencies of defendants' arguments, we therefore find that defendants have waived the above-stated issues for review.

■ Defendants further argue that the statute violates the equal protection provisions of the federal and state constitutions because it exempts professionally licensed caregivers. Defendants claim that they are similarly situated to these professional caregivers and that excluding such caregivers from the statute is similar to excluding professional truck and taxicab drivers from the state's traffic laws. Again, defendants fail to cite to authority in support of their assertion that for the purposes of equal protection they, as lay persons, are similarly situated to professional caregivers who are licensed in the State of Illinois. Moreover, we fail to see how their having once cared for an elderly person in their home gives them the same status under the law as a registered nurse or licensed physician. The fourteenth amendment of the United States Constitution only requires equality between groups of persons who are similarly situated and does not deny a state the power to treat dissimilar classes of persons differently. *People v. Tosch,* 114 Ill. 2d 474, 480-81 (1986). Further, state laws may even differentiate between persons similarly situated if there is a rational basis for doing so. *People v. Blackorby,* 146 Ill. 2d 307, 318 (1992). In Illinois, professional caregivers are already regulated under the Nursing Home Care Act (210 ILCS 45/1—101 *et seq.* (West 1992)) and the Medical Practice Act of 1987 (225 ILCS 60/1 *et seq.* (West 1992)) and, therefore, there exists a rational

basis for exempting them from a statute regulating the care of the elderly and disabled by private, nonprofessional individuals. See *Illinois Health Care Ass'n v. Illinois Department of Public Health*, 879 F.2d 286, 289-90 (7th Cir. 1989). Accordingly, we find that defendants have not demonstrated that the statute prohibiting the criminal neglect of an elderly or disabled person by an individual is unconstitutional.

Defendants next contend that they were not proven guilty beyond a reasonable doubt and that, with respect to Dale, the State failed to establish even the "threshold requirement that he was properly a caregiver for purposes of the criminal neglect statute." Defendants assert that the evidence demonstrated that the victim's condition resulted from a "sudden precipitous decline rather than a result of any alleged mistreatment."

■ In Illinois, a conviction will not be disturbed upon appeal unless the evidence is so unreasonable, improbable or unsatisfactory as to justify a reasonable doubt of a defendant's guilt. *People v. Steidl*, 142 Ill. 2d 204, 226 (1991). The standard of review is whether, when viewing the evidence in the light most favorable to the prosecution, any rational trier of fact would have found the essential elements of the offense beyond a reasonable doubt. *People v. Hendricks*, 137 Ill. 2d 31, 63 (1990). The credibility of the witnesses, the weight to be given their testimony and the resolution of any conflicts in the evidence are the province of the trier of fact (*People v. Slim*, 127 Ill. 2d 302, 307 (1989)), and a reviewing court will not substitute its judgment for that of the trier of fact (*People v. Furby*, 138 Ill. 2d 434, 455 (1990)).

■ Here, contrary to defendants' assertions, we find that the evidence overwhelmingly demonstrated that defendants were guilty beyond a reasonable doubt. The evidence established that the defendants were the victim's caregivers as contemplated by the statute. We specifically note that although Dale protests that he had no responsibilities for the victim's care and thus cannot be culpable under the statute as a "caregiver," he clearly falls within the language of the statute defining a caregiver as a *"relative by \*\*\* marriage who resides with* or resides in the same building with and regularly visits *the elderly or disabled person."* (Emphasis added.) 720 ILCS 5/12—21(b)(3)(A) (West 1992). Here, the evidence demonstrated that Dale was married to Janice, the victim's niece, and that all three resided together in the Simesters' home. Further, the medical evidence established that the victim had no nutritional intake for at least one week, that his rigid fetal position took at least two weeks to develop and that his deep coma had to have existed for several days before

his hospitalization. We find that these facts established that both Dale and Janice Simester should have reasonably known of the victim's condition long before the paramedics were summoned.

■ Defendants next contend that the trial court abused its discretion in admitting photographs taken of the victim's room that were obtained by a warrantless invasion into their home. We disagree. The testimony of the numerous witnesses who were legally on the premises because of the 911 request for assistance by defendants established the same evidence depicted by the photographs and, therefore, defendants' convictions were not based entirely on the photographs.

■ Defendants further contend that the trial court erred in admitting into evidence photographs taken of the victim at the hospital because they "depicted invasive medical procedures and trauma not inflicted by the defendants." However, the original photographs are not a part of the record on appeal and, therefore, we are unable to determine the merits of defendants' argument. We also briefly note that although there are photocopies of photographs attached to defendants' motions *in limine*, they are undiscernible and we are unable to determine which of them may be the basis for defendants' appeals.

■ Defendants next contend that the trial court erred in precluding their "geriatric care expert" from testifying that the victim's condition resulted from self-neglect and that Janice had made good-faith efforts to render care.

A trial court's determination of whether a witness has been properly qualified as an expert will not be overturned upon appeal unless it was an abuse of discretion. *People v. Free*, 94 Ill. 2d 378, 410 (1983). An individual will be permitted to testify as an expert if his experience and qualifications afford him knowledge which is not common to lay persons and where such testimony will assist the trier of fact in reaching a conclusion. *People v. Jordan*, 103 Ill. 2d 192, 208 (1984).

Here, the proposed expert witness, Sara Lieber, admitted that she had no medical training. Based on her testimony, the trial court determined that she did not possess the qualifications with which to review medical reports and to render an opinion regarding the nutritional and physical condition of the victim. Further, Lieber's proposed testimony did not concern matters beyond the competence of the average juror. More specifically, whether defendants' conduct was criminal neglect or a good-faith attempt to care for the victim was not a matter so difficult to comprehend or explain that an expert witness was necessary. See, *e.g., People v. Brown*, 100 Ill. App. 3d 57, 72 (1981).

■ Defendants further argue that the trial court erred in refusing to give their tendered jury instructions that defined knowledge, intent and mistake of fact.

In *People v. Powell*, 159 Ill. App. 3d 1005, 1013 (1987), the court held that, ordinarily, a jury need not be instructed on the terms "knowingly" and "intentionally" because the terms have a plain meaning within the jury's common knowledge. If a jury raises a specific question on a point of law arising from facts about which there is doubt or confusion, the court should attempt to clarify the issue in the minds of the jurors. *People v. Doe*, 175 Ill. App. 3d 371, 376 (1988). In the present case, the trial court stated that it would give the instructions only if the jury specifically requested that the terms be defined. Because no request was ever made, we find that the trial court did not err in withholding the instructions.

We also briefly observe that defendants' reliance on *People v. Brouder*, 168 Ill. App. 3d 938, 947-48 (1988), for the proposition that the trial court was required to give their instruction defining "intent" and "knowingly" to the jury, is misplaced. In *Brouder*, the court specifically distinguished those cases in which the jury asked to have "knowingly" defined from the cases where the jury made no such request. Because *Brouder* involved a jury that asked for the definition during deliberation, it is inapplicable to the case at bar.

Defendants lastly argue that the trial court erred in refusing their jury instruction defining "mistake of fact," asserting that Janice "presented a variety of evidence that she was mistaken as to the true physical and mental condition" of the victim.

■ The determination of which instructions shall be given to a jury lies within the discretion of the trial court and will not be overturned upon review absent an abuse of that discretion. *Martin v. Chicago Housing Authority*, 264 Ill. App. 3d 1063, 1083 (1994). The purpose of jury instructions is to provide jurors with correct principles of law that apply to the evidence that has been submitted to them. *Gaines v. Townsend*, 244 Ill. App. 3d 569, 576 (1993). Where the instructions are not supported by either the evidence or the law, the instructions should not be given to the jury. *Levenson v. Lake-to-Lake Dairy Cooperative*, 76 Ill. App. 3d 526, 536 (1979).

■ Here, the statute specifically precludes as a defense the defendant's mistake of fact as to whether the victim was disabled, *i.e.*:

> "It shall not be a defense to criminal neglect of an elderly person that the accused reasonably believed that the victim was not an elderly or disabled person." 720 ILCS 5/12—21(f) (West 1992).

Therefore, Janice's assertion that she did not know the true nature

of the victim's physical or mental condition (*i.e.*, that he was disabled), was not a proper defense in this case. Further, in light of the overwhelming evidence regarding the victim's extremely debilitated condition, we find that there was no evidence to support a "mistake of fact" instruction and, accordingly, the trial court did not abuse its discretion in failing to give such an instruction.

For the reasons stated, the judgments of the circuit court of Cook County are affirmed.

Affirmed.

WOLFSON, P.J., and CERDA, J., concur.