# Illinois Official Reports

## Appellate Court

---

### *Walker v. Chicago Housing Authority*, 2015 IL App (1st) 133788

---

| | |
|---|---|
| Appellate Court Caption | CELESTE WALKER, Special Administrator of the Estate of Clarence Allan Walker, Deceased, Plaintiff-Appellee, v. THE CHICAGO HOUSING AUTHORITY, a Municipal Corporation, and ITS TIME FOR A CHANGE RMC, an Illinois Non-for-Profit Corporation, Defendants-Appellants. |
| District & No. | First District, Fifth Division<br>Docket Nos. 1-13-3788, 1-14-3279 cons. |
| Filed | March 31, 2015 |
| Decision Under Review | Appeal from the Circuit Court of Cook County, No. 09-L-8956; the Hon. Drella Savage, Judge, presiding. |
| Judgment | Affirmed. |
| Counsel on Appeal | Karen Kies DeGrand and Elizabeth C. Christen, both of Donohue Brown Mathewson & Smyth LLC and Scott W. Ammarell, George J. Brown, and Theodore E. Bacoyanis, all of Chicago Housing Authority, both of Chicago, for appellants.<br><br>John M. Molloy & Associates (John M. Molloy and Paul A. Kotowski, of counsel) and Law Office of Harry C. Lee (Harry C. Lee and Debra A. Thomas, of counsel), both of Chicago, for appellee. |
| Panel | JUSTICE McBRIDE delivered the judgment of the court, with opinion.<br>Presiding Justice Palmer and Justice Gordon concurred in the judgment and opinion. |

# OPINION

¶ 1      Plaintiff, Celeste Walker as special administrator for the estate of Clarence Allan Walker, filed a premises liability action against defendants, Chicago Housing Authority (CHA) and Its Time for a Change RMC (RMC), alleging negligence in the death of the decedent Walker, who fell to his death in the elevator shaft in a building owned by CHA and managed by RMC. Following a bench trial, the trial court found in plaintiff's favor and awarded damages in the amount of $1.5 million to plaintiff.

¶ 2      Defendants appeal, arguing that: (1) plaintiff failed to sufficiently prove proximate cause in Walker's death; (2) the trial court erred in failing to assign any contributory fault to Walker's actions; (3) defendants did not owe a duty of care to Walker as a trespasser; and (4) the trial court's finding of willful and wanton misconduct is against the manifest weight of the evidence.

¶ 3      At approximately 9 p.m. on July 27, 2009, the decedent Walker was attempting to operate the elevator from the third floor in order for his friend Stephanie Carter to ride to the seventh floor of the residence, located at 365 West Oak, part of the Cabrini Green complex. Carter saw Walker open the hoistway elevator doors, step forward, and disappear with the doors closing behind him. Walker's body was found in the pit at the bottom of the elevator shaft and he died from the injuries sustained in the fall.

¶ 4      In July 2009, plaintiff filed a negligence complaint against CHA. The complaint alleged that on July 27, 2009, Walker was a tenant at 365 West Oak, suite 704, in Chicago and CHA used, operated, controlled, or possessed the building at that location. The elevator in the building "failed to have service and had a history of poor maintenance and poor performance." On July 27, 2009, Walker attempted to use or get the elevator to work and "was caused to slip and fall to his death onto the bottom of the elevator shaft." CHA had a duty to exercise care and diligence in the maintenance and performance of said elevator. Plaintiff alleged the following acts and/or omissions against CHA: failed to exercise reasonable care in the operation, management, maintenance and control of the elevator; failed to exercise the highest degree of care and diligence in the operation of the elevator; failed to properly maintain the elevator; maintained the elevator in a defective and unsafe condition representing a hazard; maintained the elevator in a defective and unsafe condition for an unreasonable length of time; failed to timely test and inspect the elevator in accordance with the American National Elevator Safety Code; failed to have the elevator tested and inspected by persons who have knowledge of the function, operation and maintenance of the devices involved and are capable and qualified to make the required inspection and test; and failed to warn Walker of the hazardous condition of the elevator. As a direct and proximate result of these acts or omissions, Walker suffered injuries leading to his death.

¶ 5      Plaintiff filed her first amended complaint in February 2010. Plaintiff added RMC, 1st Priority Elevator, and Hubert Wilson, individually and doing business as Top Floor Elevator Contractors, as defendants.[1] In May 2010, plaintiff filed her second amended complaint against the same parties, adding Top Floor Elevator Contractors as a separate defendant.

---

[1]1st Priority Elevator and Hubert Wilson, individually and doing business as Top Floor Elevator Contractors, have been dismissed from the case and are no longer parties to the case.

¶ 6        The second amended complaint realleged the same claims against CHA. The complaint alleged that RMC "managed the premises in question, including the elevator equipment and appurtenances in the subject premises, and was charged, contractually or otherwise, with the management of the entire premises, including, but not limited to, inspection, maintenance and repair of said elevator." The complaint asserted the same negligent acts and/or omissions against RMC that were set forth against CHA, with one additional allegation that RMC was negligent in the management of the premises, and in particular the elevator and its appurtenances.

¶ 7        A bench trial was conducted in October 2013 and the following evidence was presented.

¶ 8        Stephanie Carter testified that she was friends with Walker for 25 to 30 years. Carter was familiar with the residential building at 365 West Oak and had been visiting Walker there for 15 to 20 years. Walker lived on the seventh floor.

¶ 9        On July 27, 2009, Carter went to Walker's building at around 9 p.m. for dinner with her friend Marie Woodard and Woodard's daughter Markell. Carter stated that Walker's apartment was above the front entrance to the building. When she arrived, she called up to Walker for him to bring the elevator down. Carter testified that she called to Walker because the elevator was "always stuck up there." Carter needed the elevators because she uses an oxygen tank. She stated that Walker would bring the elevator down frequently for her and estimated that he had done this "over 20 times." She also saw and heard other people ask Walker to get the elevator for them.

¶ 10       While they waited for Walker, Woodard opted to take the stairs to Walker's unit. Carter waited with Woodard's daughter for the elevator. Carter heard Walker call through the elevator shaft to come to the third floor. When she reached the third floor, she entered the hallway past a little wall. She was to the left of the elevator. As she entered the hallway, she saw Walker pushing the elevator buttons. Carter testified that Walker was turned to his right and looking at her. Walker then turned around and stepped forward into the elevator and "disappeared." The only thing Carter could see was the top of Walker's hand. Carter tried to hurry to the elevator, but the doors "slammed" closed. Carter was not able to see inside the elevator shaft. Carter then proceeded up to the seventh floor to tell Walker's girlfriend Nichelle Dixon what had occurred.

¶ 11       Carter testified that the elevator problems began in January 2009. Carter stated that a new person, named Hubert Wilson, started working on the elevator at that time. After Wilson began to work on the elevator, she said the "elevator didn't work anymore." Carter stated that she was stuck on the elevator once and the fire department had to come and get her off. Carter also said that one time she was on the elevator and it stopped between floors. She had to open the doors and jump off. She testified that these problems did not occur until Wilson began maintaining the elevator nor did Walker have to move the elevator prior to Wilson's maintenance.

¶ 12       On cross-examination, Carter stated that when Walker stepped into the elevator, he said, "Oh s***," as he disappeared. After the elevator doors closed, Carter testified that it sounded like the elevator fell. She said "it went all the way down and it was like boom. Then it came up back up and opened up."

¶ 13       Nichelle Dixon testified that she was Walker's girlfriend and lived with him at 365 West Oak for six or seven years. She admitted that she was incarcerated from July 2008 until January 2009. On the night of July 27, 2009, she was at home with Walker. Dixon was playing cards with Walker when Carter yelled up for Walker to assist her to get up to Walker's floor.

Dixon stated that Walker put on his shoes and left the apartment to help Carter. She said Walker was going to carry Carter's oxygen. A short time later, Carter came in the apartment "screaming" that Walker had fallen down the elevator shaft. Dixon was not present at the time of the incident.

¶ 14 Dixon testified that she ran down the stairs, stopping at every floor calling for him. When she was on the first floor, the elevator doors opened. Dixon was able to see between a gap in the lobby floor and the elevator. She got on her knees and saw Walker at the bottom of the shaft.

¶ 15 Dixon stated that the elevators "were pretty consistent" in the five years she lived in the building, prior to her incarceration. When she returned in January 2009, the elevator was "down for two months." She described the elevator problems specifically: "Inconsistency. Worked one moment. Next minute down. Sometimes fixed quickly. And sometimes broken within 24 hours of being repaired." She also stated that some of the problems included, "doors not opening. Door opening and getting stuck and not closing. Not–elevator cab not going completely totally to the floor that you push, like getting stuck between floors." Dixon testified that Wilson was in charge of elevator repairs when she returned to the building in January 2009. She stated that she was not aware of Walker operating the elevators. She testified that Wilson asked Walker to hold the door open for him a couple times.

¶ 16 On cross-examination, Dixon stated that she accompanied Walker when he went to speak to RMC regarding screens for their apartment, but she was not present when he spoke to the RMC employees. Dixon admitted that she never saw Walker working on top of the elevator cab or inside the elevator shaft. She also said that Walker never told her he was working on top of the cab or inside the shaft.

¶ 17 Plaintiff testified about her relationship with her father, Walker. She stated that she visited him at his residence "all the time." She said that the elevator frequently did not work and Walker brought the elevator down for her a couple times. She also observed other residents and visitors call for Walker to bring the elevator down for them. She admitted that Walker did not have any training working on elevators.

¶ 18 Detective Luke Daly testified that he was employed as a detective with the Chicago police department. On July 27, 2009, he was assigned to investigate Walker's death at 365 West Oak. Daly identified multiple photographs from the scene as well as his report. He conducted interviews with Carter, Woodard, Dixon, Wilson, and Toni Talbert, an RMC employee. At the end of his investigation, Daly determined that this was a noncriminal matter.

¶ 19 His report summary of his interview with Wilson indicated that Wilson told him that Wilson was aware that Walker "would manipulate the elevators by moving them between floors when they got stuck, and he has warned [Walker] against tampering with the machinery in the past." Wilson also observed Walker with a "Z key" earlier on the day of the incident. Wilson described the "Z key" as "an implement used to open the elevator doors on the floors to access the shaft." Wilson indicated that he knew one of Walker's shoes and the "Z key" were found on top of the elevator cab and the second shoe was found in the pit. Wilson "theorized" that Walker was on top of the car when he fell. Wilson told Daly that "the dimensions of the shaft allow enough space at the rear of the car for a person to fall off the car and plunge to the bottom of the shaft."

¶ 20 Daly interviewed Carter twice; the first time was the day of the incident and the second time was the following day. In the second interview, Carter stated to Daly that to "the best of

her recollection she never saw the inside of the elevator cab when the doors opened." She told him that Walker "on numerous occasions would retrieve the elevator for her and other people in the building" and she was "unaware" how Walker would retrieve the elevator.

¶ 21 Daly also detailed his interview report with Talbert, the property manager of the building. She told the detective that Walker had asked for compensation for working on the elevator. On the day of the incident, Talbert told Walker not to manipulate or work on the elevator because he was not an employee. She said this conversation was documented.

¶ 22 Daly reaffirmed his deposition testimony regarding his opinion of how the incident occurred. Based on his investigation, Daly's opinion was that Walker was "atop the elevator cab." Daly's opinion was also based on the dimensions of the shaft, that "a body of his height and size would be able to go down that shaft," as well as the location of the shoe and "Z key" on top of the cab.

¶ 23 Ruby Givens testified that in July 2009, she was the RMC president. She also lived in the complex at 364 West Oak. Givens stated that she knew Walker and had no criticism of him as a tenant.

¶ 24 Givens testified that on the day of the incident, Walker came to her office and asked to be put on payroll for fixing the elevator. Givens said she told Walker not to try to fix the elevator. Givens stated that residents had reported more than 50 times that Walker had been getting the elevator for residents. Givens said she had called Walker into the office about these reports and talked to him about it. When asked if these conversations were documented, Givens said it "should have been documented in his folder." However, Givens was unable to point to any document which showed these conversations. Givens admitted that she knew long before his death that Walker was fixing the elevators and moving the elevators for tenants. Givens also testified that she received complaints on a daily basis that the elevators were out of service.

¶ 25 On cross-examination, Givens identified an entry from Walker's tenant file, dated July 27, 2009, following a meeting between Walker, Talbert, and Givens. The entry indicated that Walker came to the management office inquiring about screens, asking management why he should purchase screens when he fixed the elevators. Givens and Talbert informed Walker that "he should not be touching the elevators under no [*sic*] circumstances." Givens also stated that the complaints she received about Walker included that he was on top of the elevator cab, and she said she advised him to stop. On redirect, Givens admitted that the entry was written by Talbert and Givens was not present when it was written. She also said that Walker's tenant file might have had documents purged from it after so many years.

¶ 26 Claudell Williams and Terry Taylor each testified that they worked for First Priority. Williams stated that he was one of the owners of First Priority and the company had a contract for the monthly maintenance and repair of the elevator in 365 West Oak beginning in 2008. He said the elevator in the building was "very old" and installed about 40 years ago. He stated that the First Priority contract with defendants was terminated in January 2009.

¶ 27 Williams explained the components of the elevator system, including the machine room, which is a controller at the top of shaft, and the "car top inspection," which is a box mounted on top of the elevator cab from which the elevator can be run manually. Williams also explained that a "Z key" is a "self made key" made from wire in the form of Z that can be used to open the elevator door.

¶ 28    Williams testified about oil leaks in the elevator controls. He said that a leak from a gasket happens over the course of 15 or 20 years. When oil leaks from the machine room, there should be a drip pan under the machine in the machine room to catch any excess. He stated that the drip pan should "probably hold a half a gallon of oil." If the drip pan overflows, it will leak onto the floor.

¶ 29    On cross-examination, Williams stated that a maintenance person working on top of an elevator should wear steel-toed work boots in case anything fell and the traction would prevent slipping. Williams was shown photographs of Walker's shoes from the time of the incident and he said the shoes were not appropriate because "the foot is exposed" and "[h]e could very easily slip and fall on them."

¶ 30    Taylor testified that he was an employee of First Priority and had previously worked on the elevator at 365 West Oak. Taylor stated that if one or more gaskets or seals break or leak, the oil leaks onto the floor of the machine room and then could flow onto the cables or the cab top. Taylor also testified that he spoke with Wilson after the accident. Wilson told Taylor he was good friends with Walker and they had worked on the elevator together. Wilson said that at the time of the incident, Walker "was on top of the car trying to basically get it going." Wilson told him that from time to time, Wilson would show Walker "how to do certain things on the elevator."

¶ 31    John Donnelly testified as an expert witness for plaintiff. He stated that he has been a certified elevator inspector since 1987. In preparing his opinion, Donnelly said he reviewed depositions from Carter, Woodard, Dixon, Daly, Givens, Talbert, Williams, Taylor, Officer Fosco, Nannette Watkins, and Richard Gregory. He also reviewed time tickets for First Priority and Wilson's company, information from RMC regarding billing, police reports, and various correspondence. Donnelly performed a site inspection on August 5, 2009.

¶ 32    Donnelly testified that his opinion was as follows:

        "Basically my opinion is that he basically got on top of the elevator. It was very slippery and oily due to lack of maintenance up in the elevator machine room which allowed oil to leak down on top of the car which created an unsafe, hazardous location."

¶ 33    Based on deposition testimony, Donnelly opined that Walker was working on the elevator and that RMC management was aware of this. Donnelly disagreed with Carter's testimony that after Walker fell, she heard the elevator go down and heard a boom, then the elevator came back to the third floor and opened the doors. Donnelly said the elevator would not make any booms "because the only booms that are available is if it went all the way past the bottom floor into the basement, past the basement, and hit one of the buffers where there are switches down there that would keep it from running back up again." Donnelly testified that he thinks the boom Carter heard was when Walker hit the pit.

¶ 34    Donnelly also testified that he reviewed the time tickets for elevator repairs for both First Priority and Wilson's company, Top Floor Elevator. He did not see any time tickets for the 10 days prior to the incident.

¶ 35    During his site inspection, Donnelly saw that oil was overflowing from the drip pan in the machine room. He stated that the oil had "migrated" two to three feet from the machine, down the hoist ropes, and then onto the top of the elevator. Donnelly took several photographs, including photographs of the top of the elevator car, which showed the "Z key" and one of

Walker's shoes. The top of the elevator car also showed oil. In Donnelly's opinion, it took months for this amount of oil to accumulate.

¶ 36        Donnelly stated that his opinion that when Walker stepped onto the elevator car top, he grabbed the hoist ropes, stepped on top of the crosshead, and stepped down to get a firm footing. Donnelly said there was a lot of oil in the spot where one would stabilize his or her foot as he or she entered. It was his opinion that it was hazardous to anyone getting on top of the car. Donnelly opined that Walker likely fell over the car top based on the position of Walker's body in the pit. He noted there was nowhere else Walker could have fallen. He noted that Walker's shoes were not appropriate because they did not tie and a person's foot could slip out, but the condition of the car top would have been slippery for someone wearing boots.

¶ 37        Donnelly testified that Walker was a *de facto* apprentice of Wilson, based on Taylor's deposition testimony, Walker's possession of a "Z key," and the evidence that Walker had been working on the elevators.

¶ 38        Richard Gregory testified as an expert for defendants. He stated that he is a licensed elevator mechanic. He visited the site the day after the incident on July 28, 2009, and again when Donnelly visited on August 5, 2009. Gregory reviewed the depositions of Carter, Dixon, and Taylor. He also attended Donnelly's deposition. He read a historical report from RMC. At the time he conducted his inspection, Gregory observed that the car top inspection station was bent.

¶ 39        Gregory testified that in his opinion, Walker opened the elevator doors with the "Z key," but no elevator was present. The elevator was at the first floor. As Walker stepped in and saw this, he said, "Oh s***," and fell. Gregory opined that the elevator was at the first floor because the security guard said it was at the first floor.

> "[Walker] was at the third floor. He used a Z key, which he had made for himself, to unlock the hoistway door. He could not have done that if the elevator was present. Even if it was broken, it wouldn't have worked.
>
> He used that to unlock the hoistway door. He pushed the hoistway door open. He didn't look at where he was going to go and he just stepped in and he fell. He hit the top of the car at the front, hence dropping his Z key and losing one of his slippers, slide-on type slippers, fell over the crosshead, then fell over the back of the car. Because the car was down low, the counterweight was not behind it, and that left room for him to fall over the back."

¶ 40        Gregory further opined that if the elevator had been at the second floor, Walker would not have fallen into the pit. He disagreed with Donnelly's opinion that a person would grab the hoist ropes because the ropes are "dirty and greasy." He also disagreed that a person would step on the crosshead because it is small. He reasoned that Walker was not properly trained to be accessing and working on elevators. On cross-examination, when asked if Walker stepped in and slipped on oil and said, "Oh s***," then fell, it would fit the same scenario, Gregory answered, "possibly."

¶ 41        Following the trial, the trial court entered a written order and opinion, finding in favor of plaintiff and awarding $1.5 million in damages. The court summarized the parties' positions in the opinion. Plaintiff claimed the elevator "had failed to give service and had a history of poor maintenance and performance. As a result, Walker attempted to use the elevator or to get the elevator to work and perform at the time of his death. Accordingly, she contends that CHA and

RMC owed a duty of ordinary care." CHA and RMC responded that Walker was a trespasser to whom they owed no duty. Plaintiff countered that assuming Walker was a trespasser, then the frequent trespasser doctrine should apply. Defendants also asserted that Walker was not an intended or permitted user of the elevator under the Local Governmental and Governmental Employees Tort Immunity Act (Tort Immunity Act) (745 ILCS 10/3-102 (West 2008)), and that defendant was guilty of contributory negligence for his own death by greater than 50%.

¶ 42    The court found as follows.

"The evidence in the case at bar shows that RMC permitted Walker to access the elevator shaft and/or top of the elevator to open the doors that were jammed shut, move the elevator that was stuck between floors or stuck on one floor in order to assist residents in moving from floor to floor on numerous occasions with the use of his homemade Z-Key. He was an intended user because of his relationship with Wilson who showed him how to do some things. Additionally, RMC hired Wilson and his self-styled Top Floor to service the elevator, and keep it operational, but had no written contract of record with specific terms of employment. RMC was aware that it was Walker who often performed the minimum services First Priority owner and employee described during trial. RMC's acquiescence in allowing Walker to continually do Wilson's job of making the elevator operational for the residents made him a defacto [*sic*] employee. Wilson was not found to clarify the relationship except for the statements he made to Taylor about Walker helping him. RMC's reminder to Walker not to fix the elevator and/or its revocation of permission for Walker to do so on the day of Walker's death is not credible. The testimony of Givens, Defendants' representative was inconsistent and impeached on the issue of warnings to Walker. CHA and RMC ran a loose ship. They fired a reputable elevator company and participated in a well-meaning, but ill-ran in-house program where the new non-existent elevator company consisted of one man, Wilson and often, his helper, Walker, acting alone. After January 2009, the maintenance was lacking, and an already older and deteriorated and overused single elevator for an entire building was often unavailable for the residents."

¶ 43    The court concluded that RMC had actual notice of the unsafe condition of the elevator as well as Walker's access to it. "RMC was on notice of a pattern of Walker retrieving the elevator in the building for the residents who told them Walker would ask for money." The court held that "Walker was an intended and permitted user under these unique set of circumstances; he was Wilson's helper. Further RMC and CHA kept the elevator in such a state of disrepair by not managing Wilson or the situation, thus causing an unreasonably unsafe condition which caused residents to, in particular Walker, to fend for themselves and Wilson. It really was a situation where the CHA residents became their own employee."

¶ 44    The trial court rejected CHA's argument that Walker was a trespasser, but reviewed the evidence under this theory as an alternative.

"Accordingly, this Court believes that the evidence of record supports a finding for [plaintiff] under an ordinary negligence standard, concluding the immunity does not apply here, or even if it did, the conduct of CHA and RMC was willful and wanton. It is also a case where the Frequent Trespasser Doctrine could apply although the basis for application of the Doctrine might be supplanted by the Tort Immunity Act. Nevertheless, because of the Court's finding of willful and want [*sic*] misconduct on

the part of the Defendants, there is no need to address which standard should apply in the event there is a need to reconcile the common law doctrine with the schema of the Tort Immunity Act."

¶ 45       This appeal followed.

¶ 46       Defendants first argue that plaintiff's proof of proximate cause was insufficient as a matter of law. Specifically, defendants contend that the evidence of causation, even when viewed most favorably for the plaintiff, so overwhelmingly favored defendants that we should vacate the trial court's decision and enter judgment for defendants. Plaintiff maintains that she sufficiently established proximate cause by a preponderance of the evidence.

¶ 47       After a bench trial, we will not disturb the trial court's findings of fact unless they are against the manifest weight of the evidence. *Southwest Bank of St. Louis v. Poulokefalos*, 401 Ill. App. 3d 884, 890 (2010). "The reviewing court gives great deference to the trial court's findings because, as the trier of fact, the trial court is in a superior position to observe the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive." *International Capital Corp. v. Moyer*, 347 Ill. App. 3d 116, 121-22 (2004). A finding is against the manifest weight of the evidence only if the opposite conclusion is apparent or if the finding appears to be arbitrary, unreasonable or not based on the evidence. *Southwest Bank*, 401 Ill. App. 3d at 890; *Moyer*, 347 Ill. App. 3d at 122. " 'A trial court's judgment following a bench trial will be upheld if there is any evidence supporting it.' " *Southwest Bank*, 401 Ill. App. 3d at 890 (quoting *Nokomis Quarry Co. v. Dietl*, 333 Ill. App. 3d 480, 484 (2002)).

¶ 48       "In order to recover in an action for negligence, a plaintiff must establish the existence of a duty owed by the defendant to the plaintiff, a breach of that duty, and an injury to the plaintiff proximately caused by the breach." *Sameer v. Butt*, 343 Ill. App. 3d 78, 85 (2003). Here, defendants contend that plaintiff failed to prove proximate cause.

¶ 49       The term "proximate cause" involves two components: cause in fact and legal cause. *First Springfield Bank & Trust v. Galman*, 188 Ill. 2d 252, 257-58 (1999). Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage, but a defendant's conduct is a cause in fact of the plaintiff's injury only if that conduct is a material element and a substantial factor in bringing about the injury. *Galman*, 188 Ill. 2d at 258. "A defendant's conduct is a material element and a substantial factor in bringing about an injury if, absent that conduct, the injury would not have occurred." *Galman*, 188 Ill. 2d at 258. Whereas, "legal cause" is a question of foreseeability and "[t]he relevant inquiry here is whether the injury is of a type that a reasonable person would see as a likely result of his or her conduct." *Galman*, 188 Ill. 2d at 258. "The plaintiff bears the burden of proof on the issue of proximate cause." *Stojkovich v. Monadnock Building*, 281 Ill. App. 3d 733, 739 (1996).

¶ 50       Defendants assert that plaintiff only presented two witnesses to establish what occurred in the elevator shaft at the time of the incident, Carter and Donnelly. However, defendants fail to acknowledge the considerable circumstantial evidence to be considered with Carter's eyewitness testimony and Donnelly's expert testimony.

¶ 51       "However, as with any other factual element of a cause of action, proximate cause can be established by either direct evidence or inferentially by circumstantial evidence. When circumstantial evidence is relied upon, that evidence must support an inference that is reasonable and probable, not merely possible." *Id*. "When a party seeks to rely on circumstantial evidence, the conclusion sought must be more than speculative; it must be the

only probable conclusion that could be drawn from the known facts." *Id.* "To be sufficient to support a reasonable inference, however, circumstantial evidence need not exclude all other possible inferences." *Id.* " 'If as a matter of ordinary experience a particular act or omission might be expected, under the circumstances, to produce a particular result, and that result in fact has followed, the conclusion may be permissible that the causal relation exists.' " *Id.* at 740 (quoting Prosser & Keeton on the Law of Torts § 41, at 270 (W. Page Keaton et al. eds. 5th ed. 1984)).

¶ 52    The evidence presented at trial showed that Walker regularly was on top of the elevator car to run the elevator for residents and visitors and make repairs. Givens testified that she had known about Walker's activity with the elevator for a long time prior to his death and had received reports from residents on this. Givens stated that on the day he died, Walker came to her office seeking compensation for his work on the elevator. Testimony also showed that prior to January 2009, First Priority maintained the elevators and there were less occurrences of the elevator being out of service. After that time, Givens terminated the contract and Wilson took over maintenance and repairs. Givens received complaints daily about the elevator failing to operate properly. Taylor testified about his conversation with Wilson in which Walker helped Wilson with the elevator repairs.

¶ 53    Carter testified that Walker asked her to come to the third floor while he ran the elevator for her. As she turned into the hallway, she saw Walker pushing the buttons. When the doors opened, Walker was facing the elevator and stepped forward. She then heard Walker say, "Oh s***," as he disappeared from view and the doors closed quickly. She heard a boom, which she assumed was the elevator. Walker's body was found in the pit at the bottom of the elevator shaft. One of his shoes and his "Z key" were found on the top of the elevator car. Detective Daly's police investigation concluded that Walker was on the top of the elevator car when he fell. Donnelly observed an accumulation of oil on the top of the elevator car which he testified came from improper maintenance. Based on the position of items on the car top and Walker's body in the pit, Donnelly opined that Walker slipped as he attempted to step onto the car top and fell over the back of the elevator car.

¶ 54    Based on this evidence, the trial court could have found that it was foreseeable that Walker would access the top of the elevator car to fix it and run it for residents. Defendants failed to provide proper maintenance and repairs of the elevator, which led to the accumulation of oil on the top of the car. Defendants also were aware of Walker's activities in the elevator and took no action to prevent him from being able to access the elevator shaft. The circumstantial evidence supported the premise that Walker, in attempting to run the elevator, slipped on the oil and fell to his death. The fact that Gregory had a differing opinion does not render Donnelly's opinion and the circumstantial evidence insufficient to satisfy proximate cause.

¶ 55    In *Stojkovich*, the plaintiff filed a negligence action against the defendant elevator repair company after he fell into an elevator shaft in the Monadnock building. The evidence at trial showed that the plaintiff and several other individuals were riding in an elevator when the car stalled. After waiting at least 30 minutes, the passengers forced the elevator doors open and attempted to exit the elevator. The car was between floors and positioned above the building floor, leaving the elevator shaft exposed. *Stojkovich*, 281 Ill. App. 3d at 736-37. When the plaintiff attempted to exit the elevator, none of the other passengers were watching, but some of the passengers who exited before him did see when the plaintiff was in the act of falling

down the elevator shaft. The plaintiff's injuries prevented him from being able to remember the events. *Id.* at 737.

¶ 56 The defendant contended on appeal that the trial court should have entered a directed verdict or judgment *n.o.v.* because the plaintiff failed to prove proximate cause. The reviewing court found that the legal cause was satisfied by the testimony of the defendant's director of operations, who stated that it was foreseeable that people trapped in a stalled elevator might attempt to escape and could be injured in their exit. *Id.* at 738-39.

¶ 57 As to cause in fact, the defendant argued that no one witnessed the plaintiff's exit from the stalled elevator and fall into the elevator shaft and there was insufficient evidence presented to show that the defendant's negligence was the cause in fact of the plaintiff's fall. *Id.* at 739. The reviewing court found that, "[u]nder the known facts and circumstances of this case, even in the absence of an eyewitness to plaintiff's attempt to exit the elevator car, the inference that he fell down the unprotected elevator shaft while attempting to exit the stalled car is both reasonable and probable and could have been drawn by the jury." *Id.* at 740. "The proximate causal relationship between the negligence of [the defendant] and the plaintiff's fall and resulting injuries is supported by circumstantial evidence and the reasonable inference that might be drawn therefrom." *Id.*

¶ 58 Similar to *Stojkovich*, the evidence at trial supported a finding of proximate cause between defendants' negligence and Walker's fall. Defendants failed to properly maintain the elevator when they had prior knowledge of Walker's actions in repairing and manually running the elevator from atop the elevator car. The circumstantial evidence supports the trial court's conclusion that Walker slipped in the accumulated oil and fell into the shaft. The trial court's finding of proximate cause is not against the manifest weight of the evidence.

¶ 59 We find the circumstances of the instant case to be distinguishable from the case relied upon by defendants. In *Vertin v. Mau*, 2014 IL App (3d) 130246, the plaintiff fell down a flight of stairs and broke her elbow. The plaintiff did not feel anything give way or anything that caused her to lose her balance. *Id.* ¶ 3. She based her negligence claim on expert testimony that the stairs had multiple defects and violations of building codes, including that the stairs lacked uniformity, had an inadequate tread depth, had excessive carpeting, and lacked a handrail. *Id.* ¶ 5. The trial court granted the defendant's summary judgment motion, finding that the plaintiff failed to establish proximate cause. *Id.* ¶ 9. The Third District affirmed, holding that none of the testimony and affidavits addressed the issue of what caused the plaintiff to fall. *Id.* ¶ 14. "Absent any evidence of the cause of Vertin's fall, there is no genuine issue of material fact for the trier of fact to determine." *Id.* ¶ 16. Therefore, *Vertin* is not persuasive.

¶ 60 Defendants also contend that the trial court abused its discretion in admitting Donnelly's testimony regarding his opinion on what caused Walker to fall. Defendants assert that Donnelly's testimony that Walker slipped on oil amounted to speculation and contradicted Carter's eyewitness testimony. Although we recognize that "[a]n expert witness' opinion cannot be based on mere conjecture and guess" (*Dyback v. Weber*, 114 Ill. 2d 232, 244 (1986)), as we have already discussed, Donnelly's testimony was based on his expertise, his observations at the scene, and the evidence from other witnesses, including Carter, Daly, Givens, and Taylor.

¶ 61 Defendants cite to a case in which Donnelly's expert testimony was considered speculation as support. In *Harris Trust & Savings Bank v. Otis Elevator Co.*, 297 Ill. App. 3d 383 (1998), the plaintiff was injured when his leg became caught between the elevator car and the building

landing. Donnelly provided expert testimony for the plaintiff. He testified that the elevator should not move unless the outer door and the inner scissors gate were closed. *Harris*, 297 Ill. App. 3d at 391. He stated that the gate switch prevents the elevator from operating while the scissors gate is open. *Id.* He explained that the elevator could be operated with the scissors gate open if the wires were tied together or if the gate switch was bypassed at the controller. *Id.* In response to a question posed by the plaintiff's attorney, Donnelly opined that the defendant was negligent based upon the assumption that the gate switch was removed at the time of the accident. Defense counsel objected that Donnelly's opinion was contrary to his deposition testimony. The trial court sustained the objection and allowed defense counsel to question Donnelly on cross-examination about his deposition testimony to the effect that he did not believe that an employee of the defendant removed the gate switch. *Id.* The plaintiff objected that such opinion testimony was speculative, but the trial court overruled the objection. The trial court then struck Donnelly's prior opinion testimony. *Id.* at 391-92.

¶ 62 On cross-examination, defense counsel elicited Donnelly's opinion that "some representative of the building management had both removed the gate switch prior to [the plaintiff's] injury and later replaced the switch." *Id.* at 392. The trial court granted the defendant's motion for directed verdict, finding that the causation testimony pointed to a third person being the cause, not the defendant. *Id.* On appeal, the reviewing court found Donnelly's opinion as to who removed the gate switch to be speculation and that the trial court should not have allowed this opinion to be admitted or to have relied on it without a proper basis in directing a verdict in favor of the defendant. *Id.* at 393-94.

¶ 63 Donnelly's testimony in *Harris* has no bearing on the instant case. The circumstances in *Harris* are not analogous to the facts in this case. Further, the mere fact that a prior decision found a portion of Donnelly's testimony in an unrelated case to be speculation does not follow that his testimony in the present case is speculation. The trial court did not abuse its discretion in admitting Donnelly's expert testimony regarding his opinion on how Walker fell.

¶ 64 Next, defendants argue that the trial court failed to assign any contributory negligence to Walker. Defendants initially contend that the trial court may have misapprehended the law based on a comment in plaintiff's closing argument, but they fail to point to any misstatement of the law in the trial court's opinion and instead speculate that the trial court "may have erroneously relied on the plaintiff's error in stating the law."

¶ 65 "In a bench trial, a trial judge is presumed to know the law, and this presumption is rebutted only when the record affirmatively shows the contrary." *People v. Taylor*, 344 Ill. App. 3d 929, 937 (2003). Defendants have failed to point to anything in the record that rebuts the presumption that the trial court knew and applied the law in this case. The trial court specifically recounted in the statement of the case that defendants "maintained that Walker was guilty of contributory negligence for his own death by greater than 50%." The trial court clearly was cognizant of defendants' claim of contributory negligence and we decline to ignore the presumption that the court knew the law.

¶ 66 Defendants also assert that the trial court's decision not to find Walker contributorily negligent was against the manifest weight of the evidence. Defendants contend that the evidence of Walker's negligent conduct was "undeniable." Defendants base their argument that Walker was contributorily negligent on: Walker's shoes, testimony that Walker had bad feet and trouble walking, Walker had prior notice of the oil on the elevator car top, and his lack

of training and experience in accessing the elevator car top. Plaintiff responds that none of these points establish the proximate cause of Walker's fall.

¶ 67 "We must give great deference to the trial court's findings because the trial court, as the trier of fact, is in a superior position to observe the demeanor of the witnesses while testifying, to judge their credibility and to determine the weight their testimony and other evidence should receive." *Wildman, Harrold, Allen & Dixon v. Gaylord*, 317 Ill. App. 3d 590, 599 (2000). "Where the determination of the case depends largely upon the facts found in the record, the findings and judgment of the trial court 'will not be disturbed by the reviewing court, if there is *any* evidence in the record to support such findings.' " (Emphasis in original.) *Id.* (quoting *Schioniger v. County of Cook*, 116 Ill. App. 3d 895, 899 (1983)). "In order to warrant reversal, 'the appellant must present evidence that is so strong and convincing as to overcome, completely, the evidence and presumptions, if any, existing in the appellee's favor.' " *Id.* (quoting *Raclaw v. Fay, Conmy & Co.*, 282 Ill. App. 3d 764, 767 (1996)).

"Restatement (Second) of Torts, section 465(1) (1965), states:

'The plaintiff's negligence is a legally contributing cause of his harm if, but only if, it is a substantial factor in bringing about his harm and there is no rule restricting his responsibility for it.' " *Owens v. Stokoe*, 115 Ill. 2d 177, 183 (1986).

¶ 68 In *Martin v. Chicago Housing Authority*, 264 Ill. App. 3d 1063 (1994), an elevator helper was injured when he fell from atop an elevator car while he was attempting to repair the elevator, located on a CHA property. There, the evidence showed that CHA had terminated its contact for elevator maintenance and only provided for repairs to restore the elevators to operation. The repairs were performed by the plaintiff, a mechanic's helper, and an elevator mechanic. *Id.* at 1065-66. On the day of his injury, the plaintiff was on top of the elevator car and was attempting to control the elevator, but the controls were in disrepair and malfunctioned. The plaintiff was unable to control the speed of the elevator and he fell from the top of the elevator. *Id.* at 1066-67. The jury found in favor of the plaintiff and awarded $3,059,000 in damages, which were reduced by 17% the degree of the plaintiff's contributory negligence. *Id.* at 1065.

¶ 69 In one of the arguments on appeal, CHA contended that the plaintiff worked on the elevator and assumed the risk of injury because he knew the state of disrepair of the elevators. *Id.* at 1079. The reviewing court rejected CHA's argument.

"Even had plaintiff known of the dangerous condition, however, the CHA would nevertheless remain liable because the circumstances here indicate that the CHA could and should have anticipated that plaintiff would have proceeded to encounter the danger in order to perform his normal job duties under the contract. (See Restatement (Second) of Torts § 343A, at 218 (1965); *Deibert* [*v. Bauer Brothers Construction Co.*], 141 Ill. 2d 430 *** [(1990)]; *Dinkins v. Ebbersten*, 234 Ill. App. 3d 978 *** [(1992)]. As stated, the CHA was aware that the elevator was in an unsafe condition because it had been informed as such as early as November 8, 1983, by the City of Chicago. Nevertheless, the CHA refused to allow Mid-American or any other company to perform anything other than 'emergency repairs' on the elevator. The CHA ignored the requests by Mid-American for authorization to perform badly needed maintenance on the elevator, despite its deteriorated condition. Yet it invited and permitted repairmen, including plaintiff, to work on and about the elevator to make emergency repairs." *Id.* at 1081-82.

- 13 -

¶ 70    Similarly, in the present case, defendants knew the elevator was routinely out of service. RMC terminated the services of First Priority in the beginning of 2009 and opted for Wilson's company. The volume of the complaints about the elevator increased. RMC was aware that Walker frequently entered the elevator shaft, performed repairs, and manually controlled the elevator for residents. "The duty is one of reasonableness under the circumstances, and the CHA can still expect that its passengers and repair personnel will exercise reasonable care for their own safety." *Id.* at 1082-83. While defendants elicited testimony regarding Walker's lack of training and his shoes at the time of the incident, the determination of the degree of contributory negligence, if any, was for the trier of fact. The trial court's opinion made it clear by not assigning any degree of negligence to Walker that it rejected defendants' argument. We cannot say that any evidence relied upon by defendants was so strong as to overcome our deference to the trial court's determination. Accordingly, we find that the trial court's decision was not against the manifest weight of the evidence.

¶ 71    Defendants further argue that Walker was a trespasser, not an intended or permitted user, and, thus, they did not owe him any duty of care under the Tort Immunity Act. Plaintiff maintains that the trial court properly found Walker to be an intended and permitted user of the top of the elevator car.

¶ 72    Section 3-102(a) of the Tort Immunity Act provides:

"Except as otherwise provided in this Article, a local public entity has the duty to exercise ordinary care to maintain its property in a reasonably safe condition for the use in the exercise of ordinary care of people whom the entity intended and permitted to use the property in a manner in which and at such times as it was reasonably foreseeable that it would be used, and shall not be liable for injury unless it is proven that it has actual or constructive notice of the existence of such a condition that is not reasonably safe in reasonably adequate time prior to an injury to have taken measures to remedy or protect against such condition." 745 ILCS 10/3-102(a) (West 2008).

¶ 73    Under section 3-102(a), a municipality owes a duty of care to intended and permitted users of municipal property. 745 ILCS 10/3-102(a) (West 2008). " '[A]n intended user of property is, by definition, also a permitted user; a permitted user of property, however, is not necessarily an intended user.' " *Gutstein v. City of Evanston*, 402 Ill. App. 3d 610, 616-17 (2010) (quoting *Boub v. Township of Wayne*, 183 Ill. 2d 520, 524 (1998)). "[T]he duty of a municipality depends on whether the use of the property was a permitted and intended use" and "[w]hether a particular use of property was permitted and intended is determined by looking to the nature of the property itself." (Emphasis omitted.) *Vaughn v. City of West Frankfort*, 166 Ill. 2d 155, 162-63 (1995). "[A]s the statute makes clear, it is the intent of the local public entity that is controlling, for the duty expressed by section 3-102(a) is limited to those 'whom the [local public] entity intended and permitted to use the property' [citation]." *Boub*, 183 Ill. 2d at 525 (quoting 745 ILCS 10/3-102(a) (West 1996)). The relevant factors to consider regarding the imposition of a duty are: "(1) foreseeability that the defendant's conduct will result in injury to another; (2) likelihood of injury; (3) the magnitude of guarding against it; and (4) the consequences of placing that burden upon the defendant." *Curatola v. Village of Niles*, 154 Ill. 2d 201, 214 (1993). "Because the [Tort Immunity] Act is in derogation of the common law, it must be strictly construed against the local public entity." *Curatola*, 154 Ill. 2d at 208.

¶ 74    As we have previously discussed, the evidence at trial showed that RMC was aware of Walker's actions in accessing the top of the elevator car to perform minor repairs and manually

- 14 -

control the elevator. As the trial court found in its determination that Walker was an intended user:

> "The evidence in the case at bar shows that RMC permitted Walker to access the elevator shaft and/or top of the elevator to open the doors that were jammed shut, move the elevator that was stuck between floors or stuck on one floor in order to assist residents in moving from floor to floor on numerous occasions with the use of his homemade Z-Key."

¶ 75 We agree with the trial court. The evidence showed that RMC continued to permit Walker to access the top of the elevator car despite numerous notifications of such actions. The trial court found Givens' testimony not credible for the statement that Walker had received written warnings, but other than one entered the day he died, the warnings had been purged from his tenant file. It was foreseeable that defendants' conduct in keeping the elevator in a state of disrepair would likely cause injury to Walker. Defendants could have employed multiple measures to guard against Walker's continued access to the elevator car top, such as, powering off the elevator when it was out of service to prevent Walker from manually controlling the elevator. Defendants also could have ensured that the elevator was properly maintained as to prevent the accumulation of oil on the top of the elevator car. The burden of these actions was minor in comparison to the risk to Walker's safety. Given the unique set of circumstances presented in this case, Walker's continued access and the acquiescence of RMC to this access showed that Walker was an intended and permitted user of the property.

¶ 76 Since we have concluded that the evidence supports a finding that Walker was an intended and permitted user and thus owed a duty of due care, we need not consider whether defendants' actions were willful and wanton and whether Walker was a trespasser.

¶ 77 Based on the foregoing reasons, we affirm the decision of the circuit court of Cook County.

¶ 78 Affirmed.